## WALKER v. UNITED STATES.

## UNITED STATES v. WALKER.

### (Circuit Court, M. D. Alabama. August 2, 1905.)

1. **UNITED STATES—SUITS AGAINST—LIMITATION.**

   The limitation contained in Act March 3, 1887, c. 359, § 1, 24 Stat. 505 [U. S. Comp. St. 1901, p. 752], authorizing suits against the United States that "no suit against the government of the United States shall be allowed under this act unless the same shall have been brought within six years after the right accrued for which the claim is made," in the case of a suit by a marshal to recover fees or disbursements, begins to run as to each item from the time the service was rendered or the disbursement made, and not from the expiration of the plaintiff's term of office.

2. **SAME—SUIT AGAINST CITIZEN—RULES GOVERNING RIGHT OF RECOVERY.**

   When the sovereign comes into court to assert a pecuniary demand against the citizen or subject, the court has authority and is under duty to withhold relief to the sovereign, except upon terms which do justice to the citizen or subject, as determined by the jurisprudence of the forum in like subject-matter between man and man.

3. **ESTOPPEL—ACTS OF GOVERNMENT OFFICERS.**

   If officers of the United States are authorized to shape its course of conduct as to a particular transaction, and they have acted within the purview of their authority, their acts or omissions may in a proper case work an estoppel against the government.

   [Ed. Note.—Estoppel against state or United States, see note to State of Michigan v. Jackson, L. & S. R. Co., 16 C. C. A. 353.]

4. **UNITED STATES—COMPENSATION OF OFFICERS—RECOVERY OF PAYMENTS.**

   Where a marshal has in good faith rendered accounts against the United States, covering services of his deputies, which have been audited and allowed by the proper accounting officers, and paid in accordance with the rules which have always previously been recognized as governing such allowances, and with knowledge that the greater part of the money would be paid over to the deputies rendering the services, the government is not entitled to recover the sums so paid from the marshal after years have elapsed, and he has gone out of office, and is without remedy to recoup his loss, and during which time no objection has been made to such payments by the executive departments or by Congress, which continued to appropriate money therefor, even though the allowances may have been made under an erroneous construction of the law.

## On Motions for Judgment.

On the 8th of April, 1898, B. W. Walker, late marshal for the Middle district of Alabama, brought suit against the United States in the Circuit Court,

under the act of March 3, 1887, to recover $2,268 upon certain disallowed claims for mileage, fees, and expenses between February 14, 1890, and September 16, 1893. The United States interposed the plea of the statute of limitation of six years. Afterwards, on the 2d day of July, 1899, the United States set up a counterclaim for $842. All the claims were referred to a master to state the accounts. He reported on the facts only; his conclusions of law being waived by consent. The case and counterclaim were submitted on the report, and agreement as to certain facts, and the admission by Walker that he was not entitled to recover for the services set forth in Exhibit B to the master's report. Walker moved for decree in his favor upon the matters set forth in Exhibit A to the master's report, and for the disallowance of the government's counterclaim. The government made a counter motion to reject Walker's claims, and for judgment in its favor on its counterclaim. The facts are fully set forth in the opinion.

Chas. P. and Edwin F. Jones, for petitioner.

W. S. Reese, Dist. Atty., opposed.

JONES, District Judge. The proviso to the first section of the act "to provide for the bringing of suits against the government of the United States," approved March 3, 1887 (24 Stat. 505, c. 359 [U. S. Comp. St. 1901, p. 752]), under which this suit is brought, declares:

"No suit against the government of the United States shall be allowed under this act, unless the same shall have been brought within six years after the right accrued for which claim is made."

Petitioner's counsel contend that:

"The mere items of the account are but the details of the daily duties of the marshal, and continue until his term of office expires; that the government always regards the compensation of the marshal as subject to revision during his term of office; that he has the right, up to the time he ceases to be marshal, to present any omitted claims for services, and the limitation does not begin to run until he ceases to be marshal."

The court, under well-settled principles, has no authority to engraft exceptions upon a statute of limitations which the statute itself does not make. Adopting the petitioner's view would require the court to hold that the limitation does not run against claims for services by the marshal so long as he remains in office, notwithstanding the command of the statute that the limitation shall begin to run from the time the right accrued. Kendall v. United States, 107 U. S. 125, 2 Sup. Ct. 277, 27 L. Ed. 437. Each item of service rendered by Walker prior to the 8th day of April, 1892, is clearly barred.

In seeking the principle which must control the fate of the counterclaim, it is important to bear in mind the law and the facts of the particular transaction out of which that claim arose, and the time and circumstances under which it is brought forward. The law did not contemplate that the marshal could discharge his important duties without help, and therefore created the office of deputy marshal. It did not contemplate that either of these officers should perform public services without remuneration, and consequently made proper provision therefor. At the time of the transactions here involved that remuneration did not take the form of a salary, but consisted of a fee or allowance for each service in the marshal's

settlements at stated periods with the Treasury Department. In the matter of his compensation, the deputy marshal, although a public officer performing public services, occupied the anomalous position of a stranger to the government. Douglas v. Wallace, 161 U. S. 349, 16 Sup. Ct. 485, 40 L. Ed. 727. Nevertheless the law bound the marshal to include the fees earned by his deputies in his accounts, and to collect them from the government, in order that he might not retain more than the maximum compensation allowed by law, and that he might have a fund out of which to pay his deputies for their services. It has always been the rule that the marshal shall collect such fees, and pay over to his deputies their proportion. The agreed facts do not disclose whether Walker's deputies bound themselves in any way to repay to him the portion paid over to them, if the government, after allowing and paying these fees to the marshal, should seek to recover them from him; and it is unnecessary, therefore, to inquire whether in the absence of such a contract he could, under any circumstances, recover what he had paid them, through mistake of law, for services rendered by them. We may assume that, as between them, he bears the loss. In the discharge of his legal and moral duty, Walker prepared and rendered his accounts, including therein these particular fees, during each year of his incumbency of the office. He made no concealment or misstatement, and there was no fraud. Every one acted honestly and in good faith, relying on a long, and during the time these payments were made an unbroken, practice of the government to allow and pay for these particular services. The court to which the accounts were presented approved them, and the proper officials of the Treasury Department allowed them, and Walker collected the money from the government, and paid three-fourths of the amount of these fees to his deputies from time to time as he made settlements, and retained the balance, as was his duty to do, under the law as then construed by every department of the government which had acted or spoken on the subject. The government knew, when the money was paid to Walker, that the greater part of it would be immediately paid out to others, who in fact, whatever may be the legal theory, had rendered services to the government, to pay for which this very money was paid to him. The government repeatedly and uniformly paid these fees in a consecutive course of dealings with him for four years, and then, after a delay of five years after Walker's retirement from office, for the first time makes known its intention to correct what was at least a common error by ripping up all these settlements and compelling him to refund the money. It knew full well that every day's delay in making known to Walker its changed attitude would add to his difficulty in saving himself harmless, if, indeed, it was ever in his power after paying over the money to his deputies. If a like transaction had occurred between Walker and anybody else, he could successfully reply, when sued to recover the money:

"You are estopped. You knew that in the course of our business dealings we had repeated settlements, in which I dealt with you, not only for myself,

but for third persons to whom I was under obligation to pay for services which you recognized were for your benefit, and that out of the money you paid me, and on the faith of your acts, I was constantly paying over a part of it to these third persons. I rendered you fair and honest statements. You had my accounts examined by your representative, and we had settlements, to which we both then agreed, and on which you paid the balances in my favor. I accepted these settlements as finalities. It is now too late for you to reverse your attitude towards me as to those past and settled transactions."

After much deliberation, the court has reached the conclusion, whatever may be the general rule, that under the facts of this case the United States stands, as to its counterclaim, upon no better footing than would the private citizen, though doubtless it may recover money paid under mistake of law by its officers. It is conceded that the money the government now seeks to recover by its counterclaim was illegally paid out, that the United States cannot be defeated or barred of its rights by the mere laches of its agents, that it cannot be estopped by the unauthorized acts of its accounting officers, that it is not subject to the statute of limitations, and that the unauthorized acts of his agents never bind the sovereign. It is, however, equally true, when the sovereign becomes an actor in a court of justice, especially in an action which proceeds on equitable principles, that his rights must be determined upon those fixed principles of justice which govern between man and man in like situation, and that the sovereign will be bound, as an individual would be, by his own acts, or by (what is the same thing) acts of his agents lawfully done within the purview of the authority he commits to them.

United States v. Arredondo, 6 Pet. 712, 8 L. Ed. 547, was a suit, under an act by which the United States consented to be sued, to determine whether certain lands in Florida were private property, or passed to the government by the cession from the King of Spain. The Supreme Court said:

"By consenting to be sued, and submitting the decision to judicial action, they have considered it as a purely judicial question, which we are now bound to decide as between man and man on the same subject-matter."

When the sovereign sues, he brings with him no privileges which exempt him from the common fare of suitors. King of Spain v. Hullett, 1 Clark & F. 333; Rothschilds v. Queen of Portugal, 1 Young & C. 594. In the latter case, a question arose as to the right of the Rothschilds to retain interest out of a fund in their hands against the Queen. Baron Alderson said:

"Now, if the conduct of her most faithful majesty, through her lawfully authorized agents, was such as to induce the Rothschilds as reasonable men to suppose that by such delay they were acting in conformity to her majesty's wishes, they would justly be entitled to charge her with that interest."

In The Newbattle, 10 Ct. App. Prob. Div. L. R. 33, the owners of the Marie Louise asked that the Belgian government, which had instituted proceedings in admiralty to recover damages for a collision with one of its ships, be required to give security for the payment of damages to the defendants, who brought a counterclaim.

The order was granted, and affirmed on appeal. Brett, Master of the Rolls, said:

"If a sovereign prince invokes the jurisdiction of the court as a plaintiff, the court can make all proper orders against him. The court has never hesitated to exercise its powers against a foreign government to that extent."

Cotton, L. J., said:

"When a government comes in as a suitor, it submits to the jurisdiction of the court and to all orders that may be properly made. Regard must, of course, be had to the fact that in this case the King of the Belgians is a sovereign prince, but the order, nevertheless, is a proper one. It is a reasonable principle that a plaintiff, whose ship cannot be seized, and against whom a cross-action has been brought, put the defendant in the position as if he (the defendant) were a plaintiff in an original action against a defendant whose ship could be arrested as security."

The Supreme Court of the United States upholds the rights of its citizens against its own government, when it enters its courts against them, quite as far as the courts of England go in enforcing the rights of English subjects in suits against them by foreign princes. Indeed, it would seem it has gone a little further. There is no statute which authorizes the courts of the United States to seize property of the United States or to enforce liens thereon; yet, in The Davis, 10 Wall. 17, 19 L. Ed. 875, property of the United States on board of a vessel, which was seized by the marshal before it came into the actual possession of any officer of the United States, was subjected to a lien for salvage, against the objection of the United States. The Supreme Court said:

"The United States, without any violation of law by the marshal, was reduced to the necessity of becoming claimant and actor, to assert her claims to the cotton. Under the circumstances, we think it was the duty of the court to enforce the lien of the libelants for salvage before it restored the cotton to the officers of the government."

A like doctrine, upon like reasons, was applied in The Siren, 7 Wall. 159, 19 L. Ed. 129.

The underlying principle of all the decisions is that, when the sovereign comes into court to assert a pecuniary demand against the citizen the court has authority, and is under duty, to withhold relief to the sovereign, except upon terms which do justice to the citizen or subject, as determined by the jurisprudence of the forum in like subject-matter between man and man. The acts or omissions of its officers, if they be authorized to bind the United States or to shape its course of conduct as to a particular transaction, and they have acted within the purview of their authority, may in a proper case work an estoppel against the government. Lindsey v. Hawes, 2 Black, 560, 17 L. Ed. 265; Davis v. Gray, 16 Wall. 203, 21 L. Ed. 447; U. S. v. Bank of Metropolis, 15 Pet. 392, 10 L. Ed. 774; Sinking Fund Cases, 99 U. S. 719, 25 L. Ed. 496; U. S. v. Barker, 12 Wheat. 559, 6 L. Ed. 728; Cooke v. U. S., 91 U. S. 398, 23 L. Ed. 237; Duval v. U. S., 25 Ct. Cl. 60; Hartson v. U. S., 21 Ct. Cl. 456. The principle that the sovereign is bound by his own acts, and those of his lawfully authorized agents within the purview of their authority, is a wholesome one, and requires the courts to

visit an estoppel upon the sovereign in a proper case, where he invokes judicial action. While the application of the doctrine is attended with difficulty under our institutions, where sovereignty of the United States does not reside in any one person or collection of persons, that difficulty is no reason for rejecting the operation of the principle, if the facts of the particular case will admit of its application.

After Walker went out of office and settled his accounts, the relation between him and the government was no longer that of subordinate and sovereign in the administration of a function of government. Thereafter, they occupied the status of creditor and debtor, and that status was such that he could not be made to answer, except by reopening repeated and closed settlements. This creditor owed this debtor the same duty, not to prejudice him by delay in making known his purpose to go behind the settlements and recover money paid under them, that a private person would under similar circumstances. The attention of the government was called to the fact that these payments were being made in Tanner's suit in the Court of Claims in 1891, in which it was cast. The United States certainly knew the facts in 1893, when the Supreme Court reversed the decision of the Court of Claims. It waited five years after Walker went out of office before it manifested any dissatisfaction. It must be kept in mind that this is not a mere case of debtor and creditor, and mere delay on the part of the government to sue the debtor. If that were the whole case, the principle that the government is not bound by the laches of its agent would be fatal to the debtor's right to complain. Here there is much more. By formal and executed settlements the defendant occupies the status toward the government of a creditor whose debt had been paid, and the government occupies the relation to him of a debtor who had discharged its obligation. The relation of debtor and creditor cannot be revived, except by a changed status between the parties. The government, in order to succeed, must be entitled to change its status to Walker, and Walker's status to it. This can be effected only by reopening and vacating the executed settlements. Some affirmative act is necessary on the part of the government to effect that changed status. Whenever an affirmative act is necessary on behalf of the United States to effect or enforce a pecuniary right against an individual, the officer or department whose duty it is to do that act represents the United States as to that matter, and it is bound by his action or nonaction. United States v. Barker, 12 Wheat. 559, 6 L. Ed. 728; United States v. Bank, 15 Pet. 377, 10 L. Ed. 774.

The reopening of closed and executed settlements involves matters of discretion and judgment, and may jeopardize pecuniary interests of the government. Such questions are governmental or political in a sense, and are primarily committed to the executive departments. The laws of the United States certainly authorize some of its executive departments to determine its policy as to the reopening of executed settlements; and put upon them the duty to

determine whether it is to the interest of the United States to change its status as to them. If the department to which is committed the duty to determine whether the government will reopen a closed and executed settlement, and thus to treat as a debtor one whom it has heretofore treated as a paid creditor, delays or postpones its decision to reopen such matter until it cannot be done without prejudice and injury to one who, believing himself a creditor, and whom the United States has treated as such, in reliance upon these settlements has gone on paying out money to people for whom he really collected it from the government, it would seem, on principle, that such delay in deciding or moving under such circumstances, by such a representative of the United States, would estop it. This is something very different from the mere negligence or failure to act, which is only the laches of an agent, for which the United States is not responsible. It is not laches in any sense. It involves no element of failure to discharge or unauthorized discharge of duty. On the contrary, it is the taking of a position on behalf of the government by lawfully deciding a matter which the sovereign commits to the determination of that agent. That determination, of course, has no element of res adjudicata, and therefore may be changed by the government at will; but, as long as the status made by the executed settlement and the failure to reopen it exists and remains in force, it is the status or act of the United States. If there be delay in changing this status to the prejudice of the party who settled with the government, it is the delay of the United States. It is not necessary, however, to rest the disposition of the counter-claim, on that ground.

On the faith of the action of the government officials, Walker has paid over, from time to time through a series of years, without notice of objection from any quarter, a large part of the money to third persons for services by them rendered to the government, and in whose behalf it was his duty to present the account to the government. He has now no recourse against those third persons. The money, it turns out, was illegally paid to him. The fact has been known to the United States for years. The United States has remained inactive for years. It is the United States which now sues. It is the United States which seeks to put Walker at a disadvantage by avoiding his just claims by the statute of limitations, and yet to compel him to pay money it knew, at the time it paid it to him, he would almost immediately pay out to third persons for services they had rendered to the United States, being induced thereto by the usage and acts of the officers of the United States in time and again acknowledging and paying him such claims. Certainly, if no other department of the government could take an attitude which could bind the United States, Congress, which represents its sovereignty as to such matters, could pursue a course of conduct with reference to it, which would be that of the United States, and bind it. The history of its legislation, and its entire attitude, show that Congress, at the time these payments were made, considered them lawful, and did not disapprove them. Con-

gress enacted the law by which deputy marshals performed services for the United States in the name of the marshal. Congress knew that the deputy marshals were compensated for their services by a portion of the fees earned by them, and that its auditing officers had for years allowed and paid the fees here in dispute. Congress, with knowledge that the United States was allowing and paying these claims, and that the marshals in turn were constantly collecting and paying them over to deputy marshals, appropriated money, year after year, to pay the expenses of the courts, which it knew were made up in part in payment of these very fees. There was nothing to put even the most prudent man on inquiry, or to suggest that the claims were improper or illegal, or that the government would retrace its steps and at some future time seek to hold Walker accountable for receiving and paying out money, which all of its departments, time after time, admitted was due to him, and as to which, whatever may have been his technical relations, he was in fact and in morals only a conduit to pass the money to the persons to whom it belonged. It is not money which the government ex æquo et bono is entitled to recover from him. Whether or not the payments, at the time they were made to Walker, were in fact authorized by the existing statutes is not now material. They are transactions which have been executed and closed, and Congress, the legislative power, which could treat them as legal at that time, and thereby make them legal, did treat them as legal at that time.

In United States v. McDaniel, 7 Pet. 15, 8 L. Ed. 587, it is said:

"Usages have been established in every department of the government, which have become a kind of common law and regulate the rights and duties of those who act within their respective limits, and no change of such usages can have a retrospective effect, but must be limited to the future. A usage cannot alter the law, but is evidence of the construction given to it, and must be considered as binding on past transactions."

While this language, in view of the case before the court and subsequent decisions, cannot be construed as a declaration that money paid out without legal authority in transactions which have been settled and closed, and in accordance with the usages of the government, cannot afterwards be recovered, it is most convincing to show that the reopening of a settled and closed account, when it would result in hardship and injustice, may be prevented, if the facts and circumstances give rise to the principle of estoppel.

If this action of Congress, the usages of the executive departments, and the approval of the courts upholding the validity of these payments during the whole period of the repeated settlements with Walker, did not then represent the attitude of the sovereign as to this matter, and do not now estop the United States from recovering money honestly received by Walker and paid out by him, in reliance upon its attitude, to third persons to whom the government expected it to be paid, and against whom he has now no redress, it is difficult to conceive of any case where the sovereign may not make his courts the mere instruments of his will to amerce his own citizens for pursuing a line of conduct which was the natural and inevitable result of the sovereign's long and deliberate course of deal-

ing with them. The sovereign has no prerogative to compel his courts to depart from the fixed principles of justice when he enters their portals to adjust his business transactions with his own citizens.

It must be admitted that the estoppel as to the portion of these fees which was retained is not as strong as that relating to the portion which Walker paid out. It would seem, however, that the United States should not now be permitted to recover that portion any more than the other. These payments, when made, were treated by Congress as valid, as we have seen above, and the settlements were closed and executed before Walker went out of office, and he accepted them as finalities. The evidence does not enable the court to determine whether, if this portion of the fees be refunded by Walker, he may not be correspondingly prejudiced as to his compensation as marshal in some of the years he was in office. The amount was calculated in the sums which made up the maximum compensation he was entitled to retain during each of those four years. If the amount be now taken from him, he cannot recoup his loss, as he could at the time, by retaining a corresponding amount of other fees earned in those years. The only evidence before the court is that owing to disallowances including payments about the Mobile & Girard Railroad, Walker's aggregate compensation for the whole term of nearly four years was $550 less per annum than the maximum allowed him by law each year. This does not prove that in some of these years he did not account to the government for more than $6,000 of fees; the portions here involved being included in that amount. It would seem the burden is on the government, in such a transaction as that now before the court, to show that the accounts could be reopened to the extent it asks without doing injustice in this particular to Walker. Besides, if the court correctly apprehends the principle which controlled the government's counterclaim in Badeau's Case, 130 U. S. 439, 9 Sup. Ct. 579, 32 L. Ed. 997, it is impossible to distinguish this matter from that.

In Johnson v. United States, 124 U. S. 254, 8 Sup. Ct. 446, 31 L. Ed. 389, the Supreme Court said:

"It would be an exceedingly dangerous doctrine that settled accounts, where the United States have acted on the settlement and paid the balance found due on the basis of that settlement, could be opened or set aside merely because some of the prescribed steps in the accounting, which it was the duty of the head of the department to see had been taken, had been in fact omitted, or if they could be opened and set aside on account of technical irregularities in the allowance of expenses years afterwards, when the remedy of the party against the United States is barred by the statute of limitations, and the remedies of the United States on the other side are intact, owing to its not being subject to any act of limitations."

While that is not exactly this case, this observation of the court illustrates the danger of the doctrine which the government pushes in this case. Here, owing to the statute of limitations, the government has avoided just claims of Walker which exceed the demand involved in the counterclaim. To allow the government under

such circumstances to kill his claims with the bar of the statute, and then to take advantage of its sovereign character to recover money from Walker, who received and paid out the money in good faith, and who cannot protect himself by the statute of limitations, would be manifestly most unjust. Walker's conduct does not bring him within the principle of McElrath v. United States, 102 U. S. 441, 26 L. Ed. 189. He, unlike McElrath, accepted the final settlements made with the auditing department in full of the accounts then presented, and did not commence suit against the government to avoid its ruling as to any matters involved in those settled accounts. His attitude does not, as did that of the plaintiff in McElrath's Case, "invite the court to go behind the settlement." The result is that all the claims of Walker accruing prior to the 8th of April, 1892, must be rejected, and those accruing after that date must be allowed; and the counterclaim of the government must be disallowed.

This opinion will be filed in the case as the statute requires, and the clerk will enter upon the minutes the following findings of fact and conclusions of law, and the judgment of the court thereon:

Came the petitioner by his attorneys, also came the United States by the district attorney, and the cause and the counterclaim are submitted for decision upon the pleadings, the master's report filed herein on the 30th of June, 1905, the agreed state of facts on file, and the admissions of the parties in open court.

## Finding of Facts.

Thereupon the court finds the facts to be as follows: On the 8th day of April, 1898, Walker brought suit against the United States to recover the sum of $2,268 upon certain disallowed claims for mileage, fees, and expenses claimed to be due him between February 14, 1890, and September 16, 1893. These various claims are itemized and set forth in Exhibits A and B to the master's report. Walker was duly appointed and qualified as marshal for the Middle district of Alabama on October 21, 1889, and continued to discharge the duties of the office until June 30, 1893, when his successor qualified. During that period he had various settlements with the Treasury Department up to and including September 16, 1893. None of the items or claims embraced in his suit were included in any of Walker's settlements with the Treasury Department, but consist entirely of items omitted from his accounts on those settlements. On the various settlements made with him, Walker accepted the amounts allowed in full of the accounts presented. The petitioner, by himself and deputies, actually and necessarily performed each and all the services set forth and specified in Exhibit A to the master's report at the instance and request of the United States; and the sums charged respectively therefor are the legal fees and charges authorized by law, which Walker is entitled to demand and receive from the United States for the services, which aggregate the sum of $1,132.84 and are still unpaid. The account containing the items, as well as those specified in Exhibit B, was properly certified and presented to the accounting officers of

the Treasury Department, and disallowed before suit brought. The government's counterclaim, filed in this court July 2, 1899, is made up of amounts paid by the government for services of Walker and his deputies in and about 421 warrants of commitment, at $2 each, on the various dates and in the cases specified in Exhibit C, amounting in all to the sum of $842, which, as the counterclaim alleges, were paid to him "through errors and misconstructions of law by the occounting officers of the government." These items went into Walker's regular accounts, and were included in his settlements with the Treasury Department, and the amounts thereof were paid over to him from time to time as he made his various settlements, up to and including September 16, 1893, and have never been refunded by him. The services for which claim is made in each of these cases were actually rendered. Exhibit C to the master's report correctly sets forth the amount paid to the plaintiff as to these commitment warrants, and the dates and cases in which the payments were made. No claim is made by Walker in his suit for allowance for commitment warrants. No such allowances were made or paid to Walker, after March 6, 1893, the date of the decision in United States v. Tanner, 147 U. S. 661, 13 Sup. Ct. 436, 37 L. Ed. 321, wherein it was held that such payments were illegal. Walker paid three-fourths of the amount received by him upon these commitment warrants to his deputy marshals before the government filed its counterclaim; and at that time all remedy of Walker, if he ever had any, to recover from his deputy marshals the amount demanded of him by the government on this account, was barred by the statute of limitations. No demand was ever made upon Walker to refund these commitment fees, or dissatisfaction expressed to him by any officer of the government as to their allowance and payment, until the filing of the government's counterclaim. He presented and was allowed these claims for commitment warrants in good faith, believing them to be legal under the long-continued practice of the accounting officers of the Treasury Department. Exhibits A, B, and C to the master's report correctly state the dates, services, amounts, and case in which the various claims were made for services, mileage, and expenses, which are involved in this suit and counterclaim. The yearly compensation received by Walker during any one year of his term of office is not shown. The only evidence is that "Walker did not receive the maximum compensation of $6,000, allowed by law during his term of office from 1889 to 1893, but by disallowances and payments to agents of the Mobile & Girard Railroad received a less sum, the deficiency being for the four years about $2,200"; and this the court finds to be true.

## Conclusions of Law.

1. The court finds as a matter of law that the United States is estopped and precluded from maintaining its counterclaim, amounting to $842, and that it cannot now rightfully demand the payment thereof from the petitioner.

2. That the petitioner's admission in open court that he is not entitled to recover of the United States the claims set forth in Exhibit B to the master's report is correctly made in point of law, and that as a matter of law petitioner is not entitled to recover any of the claims set forth in Exhibit B.

3. That petitioner's claims set forth in Exhibit A, more particularly specified and described in the auditor's certificates mentioned therein, to wit, Nos. 119,133, 120,807, 122,904, 125,880, 128,907, 131,-451, 133,292, 133,461, 135,282, and 137,418, are barred by the statute of limitations of six years.

4. That the claims set forth in Exhibit A to the master's report, and more particularly specified in the auditor's certificates contained therein, to wit, Nos. 139,735, 142,073, 145,858, and 149,120, amounting in the aggregate to $217.86, are not barred by the statute of limitations, but constitute a valid obligation of the United States, which it is legally bound to pay the petitioner.

## Judgment.

Now, in consideration of the premises, it is considered, ordered, and adjudged by the court as follows: (1) That the counterclaim interposed in this suit by the United States be, and the same is, hereby rejected and disallowed. (2) That the claims of the petitioner set forth in Exhibit B to the master's report be, and the same are, hereby disallowed and rejected. (3) That all the claims preferred by petitioner for services rendered prior to April 8, 1892, and which are particularly specified and described in the auditor's certificates Nos. 119,133, 120,807, 122,904, 125,880, 128,907, 131,451, 133,292, 133,461, 135,282, and 137,418, which are made a part of the master's report in Exhibit A, are barred by the statute of limitations, and the same are hereby rejected and disallowed. (4) That the petitioner's claims, specifically set forth and described in the auditor's certificates Nos. 139,735, 142,073, 145,858, and 149,120, amounting in the aggregate to $217.86 principal, are not barred by the statute of limitations, and constitute a valid obligation of the United States, which it is legally bound to pay to the petitioner. And it is thereupon further ordered, adjudged, and decreed that the said B. W. Walker do have and recover of the United States of America, in the mode provided by law, the sum of $217.86, together with the costs of this suit from the time of joining issue upon the plaintiff's right to recover, which are now allowed and taxed at the sum of $30; the same being the amount of fees paid to the clerk of the court.