## CROSBIE et al. v. PARTRIDGE.

No. 12440—Opinion Filed March 7, 1922.

(Syllabus.)

**1. Statutes — Construction — Repeal — General and Special Statutes.**

It is a canon of statutory construction that a later statute, general in its terms, and not expressly repealing a prior special statute, will ordinarily not affect the special provisions of the earlier statute.

**2. Same — Indians — Sale of Restricted Land for Town Sites.**

The act of March 3, 1903, 32 Stat. L. 982, being a special statute and applying to the sale of restricted lands for town-site purposes, was not repealed by the act of April 26, 1906, 34 Stat. L. 137, the latter being a general statute and not expressly repealing the former.

**3. Same — Practical Construction of Executive Officers.**

The principle that the contemporaneous construction of a statute by the executive officers of the government, whose duty it is to execute it, is entitled to great respect, and should ordinarily control the construction of the statute by the courts. On the faith of a construction thus adopted, rights of property grow up which ought not to be ruthlessly swept aside, unless some great public measure, benefit, or right, is involved, or unless the construction itself is manifestly incorrect. Held, that the construction placed upon the act of March 3, 1903, and the act of April 26, 1906, and the act of June 21, 1906, 34 Stat. L. 325, by the Secretary of Interior is not subject to either of the above objections.

**4. Same.**

A contemporaneous construction by the executive department of the government of certain acts of Congress which are ambiguous, and doubtful, although such construction is inconsistent with the literalism of the act, but consorts with the equities of the case as a general rule, is considered decisive.

**5. Estoppel — Equitable Estoppel Against Government.**

In a proper case the doctrine of equitable estoppel applies against the government, whether that of the United States or that of the states.

**6. Same — Indians — Sale of Restricted Land.**

The theory that estoppel will not apply to restricted Indians, when the validity of a sale of restricted allotment is involved, has no application to a transaction initiated

by the Indian through the Secretary of Interior for the sale of his allotment, when the sale has been had by regular procedure through the Department of the Interior and the purchaser has purchased in good faith and paid the full value to the Department of Interior, and has relied upon the construction placed upon the acts of Congress by the Interior Department authorizing the sale.

**7. Indians — Sale of Restricted Land Through Interior Department — Legality —Construction of Statutes.**

Statutes of the United States providing for allotment of Indian lands and patents, with restrictions upon alienation, were enacted to protect Indians from schemes and fraudulent practices of white men, not to aid in the unconscionable and inequitable enforcement of stale claims, to the injury of innocent parties who in good faith, for value, and by regular procedure have purchased allotted Indian lands through the Interior Department of the United States.

**8. Same—Bona Fide Purchasers—Estoppel of Government and Indian Grantor.**

Where a restricted Indian has alienated or conveyed all or part of his restricted lands through the Department of Interior, and the sale has been conducted in accordance with the policy of the government, and the purchaser, acting in good faith, has paid the full value for the land, there being no fraud, and the government has received the money for the use and benefit of and approved the sale on behalf of the Indian, held, that if the facts are such that the government would be estopped from questioning the validity of the deed, the Indian would likewise be estopped.

Error from District Court, Tulsa County; Owen Owen, Judge.

Action for possession of land and to quiet title by Mary Partridge against J. E. Crosbie, Elizabeth Crosbie. Sam Yoder, Ethel Yoder, William Draper, Adelia Draper, John A. Bernier, Minnie Bernier, H. G. Barnard, Frances Barnard, C. W. Kingsbury, Ida O. Kingsbury, Morris Poplinger, Minnie Poplinger, Ralph B. Smith, Catherine Smith, Curtis Wells, W. A. Parks, Clara Parks, Oscar L. Setterstrom, Jessie Setterstrom, Fred Osborn, Laura Osborn, Waldo C. Richardson, Grace N. Richardson, Emma Garrison, Charles Page, Lucille Page, H. R. Williams, Virginia Williams, C. E. Good, E. R. Thomas, Viola Thomas, H. C. Thomas, W. J. Lamberton, T. D. Hanratty, Marie Hanratty, G. Moore, Florence H. Moore, Dora F. Nichols, L. M. Perry, George Stephens, Rosie Stephens, Mrs. L. Wanner, E. Dumit, A. Dumit, W. E. Wright, Catherine Wright, A. W. Chaplin, Thomas S. Truelove, Claire Truelove, Lee J. Woodring, S. Lautaret, Mildred Titus Gunn, Bessie M. Johnson, H. P. Porter, Lucille E. Porter, Ben J. Hill, Nettie Hill, J. A. Wolfe, A. Herring, Crosbie Heights Addition Company, a corporation, Edgar L. Bowen, Elsie Bowen, M. Bercutt, Earl J. Tuttle, Evelyn Y. Tuttle, H. H. Parks, Maggie Parks, Alma M. Lenfesty, Kirby J. Chapman, Charles Fox, J. O. Tipton, Pearl Tipton, Ashby Endacott, Alma Endacott, A. J. Burns, Annie Burns, Alexander Crow, Edith F. Crow, Scott G. Miller, Elsie Miller, C. M. Kerst, Bertha Boles, J. H. Mohr, Margaret Mohr, Labe Bercutt, E. Bercutt, Nora M. O'Connor, Dickason-Goodman Lumber Company, a corporation, C. E. McCune, Myrtle C. McCune, James H. Morgan, Lettie S. Morgan, Josie Oliver, Claude L. Dawson, Carrie C. Dawson, William Hall, Vera Hall, H. C. Thompson, Willis C. Connelly, Florence R. Connelly, Charles B. Scranton, Ada C. Scranton, C. W. Markley, Margaret Markley, Maude Rose, Charles M. Williard, A. L. Williard, D. C. Turner, Emily H. Turner, H. H. Ryan, Charles E. Dent, Evangeline Dent, H. M. Way, Linda Way, Sand Springs Railway Company, a corporation, Albert I. Eakins, Lula J. Eakins, W. H. Blakely, Lewis W. Lowry, James A. Wilhite, Mrs. James A. Wilhite, Charles R. Eitel, Ophie Bell Eitel, David Goodall, Alice Goodall, W. H. Cunningham, Ella L. Cunningham, Mary Burroughs Demming, Charles W. Demming, J. W. Higdon, Laura E. Higdon, P. C. Higdon, L. C. Logan, Enan T. Logan, Samuel J. Trammel, Johnnie Trammel, William W. Carmen, G. R. Carmen, E. E. Morey, Myrtle V. Morey, D. A. Rowe, Ethel Rowe, Joseph E. Blair, Alice M. Blair, W. H. Reese, Margaret Reese, C. A. Mayo, John A. Harrison, Maude Harrison, Elsie M. Hoxie, Fred S. Hoxie, William M. Wright, Margaret Wright, William P. Heron, June Heron, John Bolinger, Lela Bolinger, Dora Dumit, C. E. Cannady, Emily Cannady, Jessie LaRue, Gladys LaRue, Marion LaRue, Helen LaRue, Cecil Cooper, J. A. Harmuth, Freda Harmuth, Nannie E. Ten Broeck, Perry Hodge, Mabel Hodge, D. C. Bryan, Helen M. Bryan, Edwin B. Quick, Ola Crume, Lawrence E. Crume, Harry Compton, Golden Compton, J. C. Woolsey, Katherine Woolsey, J. W. Hewlett, J. D. Payne, Grace B. Payne, R. L. Cupp, Leila Cupp, Harvey Bickers, Myrtle M. Hatch, John D. Franklin, S. S. Mohrman, Claude M. Mohrman, W. C. Nichols, R. C. Alder, Alice Alder, Vesta McD. Parks, John Parks, Delia Parks, Clara B. Alworth, Charles Lind and Dovie Lind.

Judgment for plaintiff, and defendants bring error. Reversed and remanded, with directions to dismiss.

West, Sherman, Davidson & Moore, Stuart, Cruce & Bland, Rice & Lyons, Breckenridge, Bostick & Daniel, C. A. Steele, J. P. O'Meara, E. R. Hastings, Jno. F. Kerrigan, Fred V. Kopplin, Biddison & Campbell, Randolph, Haver & Shirk, Ivel M. Boyd, Lashley & Rambo, Rush Greenslade, Jno. R. Woodward, John Rogers, J.

A. Ward, and D. G. Elliott, for plaintiffs in error.

H. B. Martin. R. A. Reynolds, and Christy Russell, for defendant in error.

McNEILL, J. The facts in this controversy are undisputed, and are substantially as follows: Mary Partridge, the plaintiff, is a full-blood Creek, enrolled opposite No. 6417. October 20, 1903, she received as a part of her allotment the land in controversy. On April 9, 1907, she filed a verified petition with the Commissioner to the Five Civilized Tribes alleging she desired to take advantage of the provision of the act of Congress approved March 3, 1903, and be authorized to sell a portion of her allotment, being the land in dispute, for townsite purposes, without restrictions as provided in said act. In her application she alleged the following material facts, to wit:

The description of the land being a quarter of a quarter section, less 1.33 acres occupied as a right-of-way of the St. Loius & San Francisco Railroad. Plaintiff alleged the land was needed for town-site purposes and was unimproved except being in cultivation; that the cost of putting the same into cultivation was about $250. That it was not her homestead. That it joins Tulsa, a city having four railroads, which are named, all of which maintain stations, and there are a post-office and several express offices maintained in said city. That she could secure a large price for the land for town-site purposes; tha the land immediately east has been platted and laid out in town lots; that the land immediately west is low bottom land along the Arkansas river; that many new additions to Tulsa are now open for sale principally on the east side of the city; that she believes said land will bring a better price at this time than if sold at a later date, for the reason the growth of the city is in an easterly direction, and away from her tract of land. That said land has no value for oil and gas purposes, but is suitable for a residence district as an addition to said city. That she desires to sell the land in a body and has a contract to sell the same for a consideration of $10,000, which she believes would be an advantageous sale. That with the proceeds she will buy other land and improve other land owned by her in the Creek Nation. That she receives nothing from any one for the right of occupancy of the land or from any other source, except annual rents for agricultural purposes.

After filing her application with the Commissioner to the Five Civilized Tribes, the commissioner transmitted said application to the Commissioner of Indian Affairs, who transmitted the record to the Department of Interior with recommendations that the petition to sell the land in one body for town-site purposes be granted, provided the consideration should not be less than $10,000. Considerable correspondence passed between these branches of the department, and the Commissioner to the Five Civilized Tribes was authorized to have the land appraised and to advertise the same for sale, calling for sealed bids, the sale to be under the supervision of the Union Agency at Muskogee. The land was advertised and the defendant, Crosbie, and numerous other parties filed sealed bids with the Agency, Crosbie bidding $14,560, that being the highest bid and was accepted. The land was appraised at $14,000.

On February 11, 1908, the plaintiff and her husband executed a general warranty deed conveying the land to Crosbie, and the Commissioner to the Five Civilized Tribes forwarded a report of the sale, with the deed and consideration, to the Commissioner of Indian Affairs, recommending that the sale be approved. The Commissioner of Indian Affairs forwarded the record of the sale and the consideration to the Secretary of Interior and recommended as follows:

"In view of the fact that the land is needed for town-site purposes; that the consideration paid is adequate; and that the department is to have control of the consideration so that it will not be wasted or pass into the hands of unworthy persons, the office concurs in the recommendation of the agent and acting Commissioner Ryan that the deed be approved."

The Secretary of Interior, on April 15, 1908, approved the deed in the following language:

"Department of the Interior, Washington, D. C., April 15, 1908. Upon the recommendation of the Commissioners of the Five Civilized Tribes and under the acts of Congress approved March 3, 1903, and June 21, 1906, the restrictions upon the alienation of the land allotted to Mary Partridge described in this deed are hereby removed and the within deed is approved. James Rudolph Garfield, Secretary of the Interior."

The deed with the approval of the Secretary and the consideration, was returned by the Secretary of Interior to the Union Agency at Muskogee, with instructions to deliver the deed to Crosbie and place the consideration to the credit of Mary Partridge in that branch of the department. The defendant Crosbie then took possession of the land, and the same was platted,

the streets paved, sewerage installed, residences constructed, and at present there are only a few vacant lots. The lots were sold to various and different parties who are defendants herein. In 1913 Mary Partridge executed a quitclaim deed to Crosbie. It is admitted, however, that this deed was of no force and effect.

In 1920 the plaintiff brought this action for possession of the entire tract of land and to quiet her title, contending the Secretary of Interior was without authority to remove her restrictions, and the deed executed by her and approved by the Secretary of the Interior was in violation of section 19 of the act of Congress of April 26, 1906, 34 Stat. L. 137, and void.

The defendant Crosbie answered, referring to the proceedings before the Interior Department regarding the sale, that he had bid upon the land without any knowledge of defects in the title and paid the purchase price, and believed that the deed approved conveyed to him perfect title; that he had conveyed the same to Crosbie Heights Addition Company, and that the corporation paid a valuable consideration, and was a purchaser in good faith wthout any notice of defects in the title; that the land was sold to divers persons, who are innocent and bona fide purchasers, and that the plaintiff since said time stood by and permitted the lands to be sold in lots and blocks and costly improvements placed thereon by defendant as well as others, and that plaintiff asserted no title, claim, or interest in the property, and has been guilty of laches and is barred and estopped from claiming title.

Plaintiff replied, referring to letters of the Interior Department which question the authority of the Secretary to remove restrictions and approve the deed.

The case was tried to the court without a jury, on the question of the validity of the deed to Crosbie, and the court rendered judgment in favor of plaintiff and against defendants. From said judgment, the defendants have appealed.

There are but two questions involved in this case: First, the validity of the deed executed by the plaintiff to defendant Crosbie, which depends upon the authority of the Secretary of Interior to remove the restrictions and approve the conveyance; and second, is plaintiff estopped from denying the title of defendants?

The acts of Congress to be considered in determining the validity of the deed in question are the Indian Appropriation Bill, being the act approved March 3, 1903, 32 Stat. L. 982; section 19 of the act of April 26, 1906, 34 Stat. L. 137, and the Indian Appropriation Bill of June 21, 1906, 34 Stat. L. 325. If the act of March 3, 1903, supra, was not repealed by the act of April 26, 1906, the provisions of that act having been complied with, it necessarily follows, the deed is valid.

If the question of whether the act of March 3, 1903, was repealed by the act of April 26, 1906, is not free from doubt, and the executive department whose duty it was to construe said acts places a contemporaneous construction upon the act, holding the latter did not repeal the former, and dealt with people generally upon this theory, and innocent parties, relying upon that construction, purchased land and paid the full value, the court will accept the construction of the department as decisive.

If the act of June 21, 1906, is ambiguous and subject to two constructions, one of which would grant the Secretary of Interior authority to remove restrictions, and the executive department placed that construction upon the act and dealt with the public generally upon that theory, and sold and disposed of land, and valuable property rights have vested, relying upon that construction, the court will accept that construction, unless some great public question, right, or interest is involved, or unless that construction is manifestly incorrect.

In considering these questions it is well to look to prior legislation applicable to the Five Civilized Tribes and the manner in which the title to the lands of the Five Civilized Tribes was held. The title to all the land in the eastern portion of what is now the state of Oklahoma was held in tribal ownership by the different nations of the Five Civilized Tribes. Congress, no doubt, deemed it necessary to break up this tribal holding and permit this vast territory to be developed and become a part of one of the states of the Union. In 1893 Congress created the Dawes Commission for the purpose of negotiating with the Five Civilized Tribes for the ultimate purpose of extinguishment of their tribal title. Congress thereafter passed certain acts regarding establishment of town sites in the Indian Territory.

One of the acts of Congress was an Indian appropriation bill approved May 31, 1900, 31 Stat. L. 221, which provided for the surveying and platting of town sites having 200 population or more, in such

manner as would best subserve the then present needs and reasonable prospective growth of such towns. It was no doubt anticipated by Congress that the natural result of opening up a vast strip of territory of this kind and character of land for settlement would be the building of cities and towns thereon. Congress made its Original Agreement with the Creeks which was approved March 1, 1901, and ratified by the Creek Nation May 25, 1901, 31 Stat. L. 861. This agreement provided for the allotment of the lands of the Creek Nation. It, however, reserved from allotment: "All lands set apart for town sites." It provided for disposing of town sites and the appointment of town-site commissions. Section 7 of said act provides that the lands allotted to any citizen shall not be alienable before the expiration of five years, except with the approval of the Secretary of Interior. Thereafter the Supplemental Creek Agreement was approved by Congress and ratified by the Creek Nation, being the act of June 30, 1902, 32 Stat. L. 500. Section 11 of this act provided for the establishment and disposition of town sites. Section 16 provided for restrictions against alienation of the land allotted before the expiration of five years from the date of the approval of the act, except by approval of the Secretary of Interior.

Congress then passed the act of March 3, 1903, 32 Stat. L. 982, which provided for the unrestricted alienation of land for town-site purposes where stations are located along the line of a railroad, when recommended by the Commissioner to the Five Civilized Tribes and approved by the Secretary of Interior. Up to this time the allotted lands of the different tribes could not be alienated except with the approval of the Secretary of Interior and under such rules and regulations as he might prescribe. Congress was no doubt confronted with the proposition at the time of passing this act that the lands adjoining the various town sites had been allotted, and it was necessary to make some special provision whereby the allottee could sell and dispose of his allotment, if the land was necessary for town-site purposes, so as not to prevent the proper growth of said town. This was not to be done unless recommended by the Commissioner to the Five Civilized Tribes, and approved by the Secretary of Interior.

Congress, by act of April 21, 1904, provided for removal of certain restrictions and permitted the alienation of certain lands. In 1906 the restrictions on alienation embodied in the Original Creek Agreement and the Supplemental Agreement were about to expire by limitation. Congress, on April 26, 1906, 34 Stat. L. 137, passed:

"An act to provide for the final disposition of the affairs of the Five Civilized Tribes in the Indian Territory and for other purposes."

Section 19 of said act provided that no full-blood Indian could alienate, sell or dispose of the land allotted to him for a period of 25 years from and after the passage and approval of the act, unless such restrictions prior to the expiration of said period be removed by act of Congress. This act made no provision regarding town sites, nor reference to the sale of full-blood land for town-site purposes, whether the sale would be beneficial to the Indian or whether it was necessary for the proper development of the town. Section 29 of this act provided:

"That all acts and parts of acts inconsistent with the provisions of this act be, and the same are hereby, repealed."

The first question for consideration is whether sections 19 and 29 of the act of April 26, 1906, had the force and effect of repealing the act of March 3, 1903.

The Supreme Court of the United States in the case of Hess v. Reynolds, 113 U. S. 73, 28 L. Ed. 927, had occasion to contrue a repealing clause almost identical with the one in the case at bar; the only material difference being, instead of the word "inconsistent", used in the act of April 26, 1906, the word "conflict" was used. The act of Congress construed in that case was the act of March 2, 1867, which was an act providing for the removal of cases from state courts to the federal court upon the plaintiff or defendant filing in the state court an affidavit stating that he had reason to and did believe that by reason of prejudice or local influence he would not be able to obtain justice in the state court. The act then provided the procedure to obtain said removal. Thereafter Congress passed the act of March 3, 1875, which was a general law regarding the removal of cases from the state court to the federal court. This act failed to mention or provide for removal of actions on account of prejudice or local influence. The procedure for removal was different. Still the court held the acts were not in conflict, and in discussing the question said:

" 'That all acts and parts of acts in conflict with the provisions of this act are hereby repealed.' This implies very strongly that there may be acts on the same subject which are not thereby repealed.

"The usual formula of a repealing clause intended to be universal is, that all acts on this subject or all acts coming within its purview, are repealed, or the acts intended to be repealed are named or specifically referred to. In this case the effect of the statute as a repeal by implication, arising from inconsistency of provisions or from the supposed intention of the Legislature to substitute one new statute for all prior legislation on that subject, is not left to its usual operations, but the statute to be repealed must be in conflict with the act under consideration, or that effect does not follow. And this was wise, for Congress well knew that there were many provisions of the laws for such removals which might or might not come under the provisions of the act of 1875 and which might be exercised under regulations different from that statute, and accordingly these were left to stand so far as they did not conflict with that act.

"The provisions of the act of 1867, by which removals are authorized on the ground of prejudice and local influence, is embodied in the Revised Statutes in the third clause of section 639. It declares that in such a case, with the requisite citizenship, when the non-resident party files the proper affidavit, at any time before the trial or final hearing of the suit, it shall be removed. We do not think this provision is embraced in the act of 1875, which says nothing about prejudice or local influence, and is not in conflict with that act. We are of opinion that this clause of section 639 remains and is complete in itself, furnishing its own peculiar cause of removal and prescribing, for reasons appropriate to it, the time within which it must be done. One of these reasons is, that the prejudice may not exist at the beginning, or the hostile local influence may not become known or developed at an earlier stage of the proceedings. Congress, therefore, intended to provide against this local hostility, whenever it existed, up to the time of the trial."

This discussion is applicable to the two acts of Congress in controversy. The act of March 3, 1903, prescribes the method by which a member of the Five Civilized Tribes, whose allotment is contiguous to a town through which a railroad passes, may alienate the same when it is deemed it will be to the best interest of the allottee, and when the land is necessary for townsite purposes. This could be accomplished upon recommendation of the Commissioner to the Five Civilized Tribes, and the approval of the Secretary of Interior. The different acts of Congress disclose Congress did not intend to retard the growth and development of the various cities and towns in the Indian Territory or prevent the alienation of land that was necessary to insure their future growth and prosperity. The latter act provides that the allotment of a full-

blood could only be alienated by removal of restrictions by an act of Congress. When we consider that the first act was special in its application, and the latter general, there is no inconsistency between them. These acts can be reconciled, and both be given force and effect, one of which is special and particular, and prescribes its own procedure, which is different from the general statute.

For cases reflecting the same principle, see Petri v. Creelman Lmbr. Co., 199 U. S. 487, 50 L. Ed. 281; Dolittle v. Bryan, 55 U. S. 563, 14 L. Ed. 543. In the case of Muskogee Times-Democrat v. Board of County Commissioners, 76 Okla. 188, 184 Pac. 591, this court said:

"Where there are two provisions of the statute, one of which is special and particular and clearly includes the matter in controversy, and where the special statute covering the subject prescribes different rules and procedure from those in the general statute, it will be held that the special statute applies to the subject-matter, and that the general statute does not apply."

There is another principle of law to be considered, and that is, an act of Congress, general in its application, does not repeal a former act which is special in its application, although inconsistent, unless the intent to repeal is clearly expressed. This rule is stated in the case of Hemmer v. United States, 204 Fed. 898, as follows:

"Privileges granted to a certain class by special act are not affected by inconsistent general legislation, unless a contrary intent of the legislative body is clearly expressed or indubitably inferable therefrom. But the special act and the general law stand together, the one as the law of the particular class and the other as the general rule. Frost v. Wenie, 157 U. S. 46, 15 Sup. Ct. 532, 39 L. Ed. 614; South Carolina ex rel. Wagner v. Stoll, 17 Wall. 425, 436, 21 L. Ed. 650; Rosencrans v. United States, 165 U. S. 257, 262, 17 Sup. Ct. 302, 41 L. Ed. 708; Townsend v. Little, 109 U. S. 504, 512, 3 Sup. Ct. 357, 27 L. Ed. 1012; Petri v. Creelman Lumber Co., 199 U. S. 487, 499, 26 Sup. Ct. 133, 50 L. Ed. 281; Ex parte United States, 226 U. S. 420, 424, 33 Sup. Ct. 170, 57 L. Ed. 281; Gowen v. Harley, 56 Fed. 973, 976, 978, 979, 6 C. C. A. 190, 193, 195, 196; Christie-Street Commission Co. v. United States, 136 Fed. 326, 332, 333, 69, C. C, A. 464, 470, 471: Board of Com'rs v. Aetna Life Ins. Co., 90 Fed. 222, 227, 32 C. C. A. 585, 590; Bear v. Chicago, Great Western Ry. Co., 141 Fed. 25, 27, 72 C. C. A. 513."

The rule announced in Ency. U. S. Supreme Court Reports, vol. 11, page 101, is as follows:

"It is a canon of statutory construction that a later statute, general in its terms

and not expressly repealing a prior special statute, will ordinarily not affect the special provisions of such earlier statute."

In the case of Rodgers v. United States, 185 U. S. 84, 46 L. Ed. 816, in the body of the opinion it is stated:

"It is a canon of statutory construction that a later statute, general in its terms and not expressly repealing a prior special statute, will ordinarily not affect the special provisions of such earlier statute. In other words, where there are two statutes, the earlier special and the later general—the terms of the general broad enough to include the matter provided for in the special,—the fact that the one is special and the other is general creates a presumption that the special is to be considered as remaining an exception to the general, and the general will not be understood as repealing the special, unless a repeal is expressly named, or unless the provisions of the general are manifestly inconsistent with those of the special. In ex parte Crow Dog, 109 U. S. 556, 570, sub nom. Re Kang-Go-Shun-Ca, 27 L. Ed. 1030, 1035, 3 Sup. Ct. Rep. 396, 405."

As stated in the case of Hess v. Reynolds, supra:

"The usual formula of a repealing clause, intended to be universal, is, that all acts on this subject or all acts coming within its purview, are repealed, or the acts intended to be repealed are named or specifically referred to."

If Congress intended the general law to repeal the special law, it could have clearly expressed that fact by referring to the act, or providing a repealing clause broad enough to include all former acts; but the repealing clause adopted in the instant case implies very strongly that there may be acts on the same subject which are not repealed.

By applying the principles of law above announced to the case at bar, it would seem there is but one logical conclusion to reach, to wit: The act of April 26, 1906, did not repeal the act of March 3, 1903, but that both acts stood as the law of the land, the one act special and applying to special cases, the other general in its nature, and applying to all cases not coming within the purview of the special act.

There is, however, another principle of law which we think is controlling in the case at bar, should we be mistaken regarding whether the act of March 3, 1903, was repealed by the act of April 26, 1906: Where doubt exists whether a general statute has repealed a former special statute, and the legislative body has thereafter enacted another ambiguous statute which might include the same subject-matter covered by the special act, and the statutes have been given a contemporaneous construction by those whose duty it is to execute them, the courts will adopt said construction as conclusive where it has been acted upon by innocent parties, and property rights of vast importance have been fixed, relying upon the construction placed upon the different acts by the executive department, unless some great public measure, benefit, or right is involved, or the construction is manifestly incorrect.

In the case of Pennoyer v. McConnaughy, 140 U. S. 1, 35 L. Ed. 363, on page 370, the court stated as follows:

"The principle that the contemporaneous construction of a statute by the executive officers of the government, whose duty it is to execute it, is entitled to great respect, and should ordinarily control the construction of the statute by the courts, is so firmly imbedded in our jurisprudence that no authorities need be cited to support it. On the faith of a construction thus adopted, rights of property grow up which ought not to be ruthlessly swept aside, unless some great public measure, benefit, or right is involved, or unless the construction itself is manifestly incorrect. We do not think the construction of the act of 1878 by the board of commissioners is subject to either of these objections."

In the case of United States v. Alabama Great Southern Railroad Co., 142 U. S. 615, 35 L. Ed. 1134, the court stated as follows:

"When the executive department charged with the execution of a statute gives a construction to it, and acts upon that construction for a series of years, the court looks with disfavor upon a change whereby parties who have contracted with the government on the faith of the old construction may be injured; especially when it is attempted to make the change retroactive, and to require from the contractor repayment of moneys paid to him under the former construction."

On page 621, the court used this language:

"We think the contemporaneous construction thus given by the executive department of the government, and continued for nine years through six different administrations of that department—a construction which, though inconsistent with the literalism of the act, certainly consorts with the equities of the case—should be considered as decisive in this suit. It is a settled doctrine of this court that, in case of ambiguity, the judicial department will lean in favor of a construction given to a statute by the department charged with the execution of such statute, and, if such construction be acted upon for a number of years,

will look with disfavor upon any sudden change, whereby parties who have contracted with the government upon the faith of such construction may be prejudiced. It is especially objectionable that a construction of a statute favorable to the individual citizen should be changed in such a manner as to become retroac'ive, and to require from him the repayment of moneys to which he had supposed himself entitled, and upon the expectation of which he had made his contracts with the government."

In the case of United States v. Healey, 160 U. S. 136, 40 L. Ed. 369, the court stated as follows:

"When the practice in a department in interpreting a statute is uniform, and the meaning of the statute, upon examination, is found to be doubtful or obscure, this court will accept the interpretation by the department as the true one; but where the departmental practice has not been uniform, the court must determine for itself what is the true interpretation."

This same principle is announced in vol. 11, Enc. of U. S. Supreme Court Reports, 139; Studebaker v. Perry, 184 U. S. 258, 46 L. Ed. 528; Fairbank v. United States, 181 U. S. 283, 14 L. Ed. 862; United States v. Philbrick, 120 U. S. 59, 30 L. Ed. 561; Blanset v. Cardin, 261 Fed. 309. In the case of Jacobs v. Prichard, 223 U. S. 200, 56 L. Ed. 405, the court stated as follows:

"The construction given by the Department of the Interior to the consents of Indian allottees, under the act of March 3, 1893, (27 Stat. at L. 612, chap. 209), to tne sale and appraisal of that portion of the allotted land not required for their homes, as surviving the decease of those giving them, would control in case of ambiguity in the statute; especially since the Secretary of the Interior is directed 'to make the necessary regulations to carry out the purposes' of its enactment."

Now, let us apply that part of the case of Pennoyer v. McConnaughy, supra, where the court stated:

"On the faith of a construction thus adopted, rights of property grow up which ought not to be ruthlessly swept aside, unless some great public measure, benefit, or right is involved, or unless the construction itself is manifestly incorrect."

—to the facts in the case at bar. There is no public measure, benefit, or right involved in this case. But it can be said that, by reason of the construction of the executive department, rights of property of great value have grown up, and these should not be ruthlessly set aside, unless the construction is manifestly incorrect. It cannot be said as a certainty the act of April 26, 1906, repealed the act of March 3, 1903, and the

act of June 21, 1906, is conceded to be ambiguous. Let us look to the case of United States v. Alabama Great Southern Ry. Co., supra, where the court said:

"A construction which, though inconsistent with the literalism of the act, certainly consorts with the equities of the case—should be considered as decisive in this suit."

If we apply this principle of law to the facts in the case at bar, then let us admit that the construction placed upon the act of June 21, 1906, is inconsistent with the literal meaning of the act. The construction placed upon the act is certainly in accordance with the equities of this case, especially where a full-blood Indian and the Department of the Interior have by their joint actions conducted a sale of the Indian's land, received the full value for the land, and the money been paid to the Interior Department, whose duty it is to see that the Indian has not been overreached. The only purpose of the suit is to enforce a stale and inequitable claim against innocent purchasers. Let us consider another sentence:

"If such construction be acted upon for a number of years, will look with disfavor upon any sudden change, whereby parties who have contracted with the government upon the faith of such construction may be prejudiced."

This construction has been adhered to since the year 1908, and neither the plaintiff nor the Department of Interior has ever attempted to question that construction, nor has Congress ever seen fit to mention the construction the department has placed upon these acts, and more than 100 innocent parties have purchased upon the faith of that construction. It would not show good faith now, either upon the part of the government or the plaintiff, to deprive them of their property that was purchased relying upon the construction the plaintiff and the governmental agency placed upon the acts of Congress. We think the facts in the case at bar come squarely within the rule announced in the above opinion.

Let us now look to the case of United States v. Healey, supra:

"When the practice in a department in interpreting a statute is uniform, and the meaning of the statute, upon examination, is found to be doubtful or obscure, this court will accept the interpretation by the department as the true one."

Does the record in this case disclose the construction adopted by the Secretary of Interior has been uniform? We think it does. In several letters this question was

discussed, and it was stated that doubt existed in the mind of the officer writing the letter whether the department had the authority to remove the restrictions, but in every case the department reached the conclusion that it had. The letter of the Acting Secretary of the Interior dated June 24, 1907, discloses that the department construed these acts of Congress to give it authority to remove restrictions upon full-blood Indian land and permit the same to be sold for town-site purposes when it was clearly shown that said alienation would be for the best interest of the Indian, and when the land was necessary for the development of the town site. According to this letter, this construction was adopted in the Nocus Fixico case May 3, 1906; in the George W. Tiger case November 14, 1906, permitting the alienation of his homestead as an addition to the town site of Muskogee; in the Joseph Wright case, December 26, 1907, a full-blood Choctaw, permitting alienation as an addition for town-site purposes at Caney, Okla.; and also the application of Hattie Deer Atkinson; also the application of James Terrapin, a full-blood Cherokee, being an addition to the town site of Bartlesville. This last application was first denied for the reason the mineral rights were reserved to the allottee, and thereafter, on March 25, 1907, the same was granted. The application of Elizabeth Dunbar to sell approximately six acres adjoining the town site of Okmulgee was denied. But in denying the application, the commissioner stated as follows:

"While the words 'any allottee' are sufficiently broad to include full-blood allottees, yet in view of the absolute prohibition of said section 19, the alienation of allotments by full-blood allottees of the Five Civilized Tribes for town-site purposes ought not to be allowed, except it be clearly shown that such alienation will be for the best interest of the Indian and that the land is necessary for the development of the town site. This is not shown to be the case in the present instance, and the petition must be, and is hereby, denied."

There are several letters in the record disclosing that the authority of the department was questioned and doubt existed as to this right, but, after expressing some doubt. the department always followed the construction that the acts of Congress gave them authority to remove the restrictions, and that was their final decision in each instance.

The letter of September 24, 1907, from Larabee, acting commissioner, to the Department of Interior, referred to the fact that the Attorney General had held under a letter dated July 24, 1906, in the Mose Chigley case, that the Indian had no authority to alienate his property after approval of the act of April 26, 1906, under a certificate of restrictions. While the letter is not clear as to the facts in the Chigley case, yet it infers the department had removed the restrictions under the act of April 21, 1904, and that was the only question involved. It does not appear the act of March 3, 1903, was called in question, nor was it an attempt to alienate the land or remove restrictions under that act to permit a sale for town-site purposes. We are, therefore, of the opinion that the contemporaneous construction placed upon these acts of Congress by the plaintiff herself and the Secretary of Interior consorts with the equities of the case, and should be considered as decisive in this suit.

It is contended by the defendant in error that in construing statutes we often look to subsequent legislation upon the same subject for the purpose of ascertaining the intent of the lawmakers, and by application of this rule of construction the fact that Congress passed the act of June 21, 1906, must be conclusive that Congress itself considered the act of March 3, 1903, was repealed by the act of April 26, 1906. The act of June 21, 1906, is as follows:

"That for the purpose of allowing any Indian allottee to sell for town-site purposes any portion of the lands allotted to him the Secretary of the Interior may, by order, remove restrictions upon the alienation of such lands and issue fee-simple patents therefor under such rules and regulations as he may prescribe.

"That upon the recommendation of the Commissioner to the Five Civilized Tribes and with the approval of the Secretary of the Interior any allottee in the Indian Territory may be permitted to survey and plat at his own expense for town-site purposes his allotment when the same is located along the line of any railroad where stations are located."

It is admitted by all the parties to this litigation that this act is ambiguous. Defendant in error contends the first paragraph of the act does not apply to the Five Civilized Tribes. If it has no application to the Five Civilized Tribes, the second paragraph, if we give it a strict interpretation, has no force and effect. It does not authorize the alienation of land for town-site purposes, nor does it authorize the Secretary of Interior, upon recommendation of the Commissioner to the Five Civilized Tribes, to remove restrictions.

If we apply this rule of construction, we are then confronted with a peculiar proposition. We have a question for consideration that is not free from doubt. Can we clarify this situation by considering a statute that is ambiguous? We think not. The plaintiff introduced a part of the Congressional Record, where the members of Congress discuss matters relating to the act of April 26, 1906. This evidence was stricken by the trial court, but we do not think it is of any aid in determining the questions for consideration.

If we should be in error as to the above propositions, under the facts in this case, is the plaintiff estopped from questioning the title of defendants? The plaintiff, by petition, applied to the Secretary of Interior to remove restrictions upon this land, and permit her to sell the land for town-site purposes, asserting the Interior Department had such authority under the act of March 3, 1903. The Secretary of the Interior, after investigation, and receiving the opinion of the other branches of its departments, decided the department had jurisdiction to remove the restrictions and authorize the sale of the land. It further decided that it would be for the best interest of the plaintiff that the land be sold, and it had authority to prescribe the manner of the sale, and it ordered the land advertised, and the public generally invited to bid upon the land. In response to this advertisement of the department, the defendant Crosbie filed his bid. This bid was accepted and approved by the plaintiff herself and the Secretary of Interior. The plaintiff, to carry out her part of the transaction, executed a warranty deed. The Department of the Interior, to carry out its part of the transaction, removed the restriction and approved the deed, accepted the defendant's money, deposited it to the credit of the plaintiff, and the department still has the money, unless it has paid the same to the plaintiff. The defendant acted in good faith, paid the full value of the land, at the time of the sale.

The question of estoppel, however, is not presented by plaintiffs in error upon the proper theory. The defendant in error relies upon the case of Smith v. Williams, 78 Okla. 297, 190 Pac. 555, where the court stated as follows:

"It has been the settled policy of this court, and also of the federal courts, in determining the validity of deeds to restricted Indian lands, to look to the acts of Congress alone. * * * Therefore title to restricted Indian land cannot be acquired from the allottee upon equitable grounds. The methods prescribed by Congress are exclusive."

The above case and the former decisions of this court announcing the same principle announce the general rule and are correct, but are not applicable to the facts in the case at bar. In the Smith v. Williams Case, supra, and all of the former cases presented to this court, the party attempting to seek equitable relief on the grounds of estoppel by deed violated the acts of Congress and the construction placed upon said acts by the Department of the Interior, and the Secretary of Interior did not advertise and conduct the sale, nor join in said conveyance, nor was it a party to the transaction. The only case we recall where this question could have been presented to this court was in the case of Brown v. Minshall, 83. Okla. 98, 202 Pac. 1037. In that case the oil and gas lease was approved by the Secretary of the Interior, and the Secretary of the Interior exercised control over the royalty, but the question of estoppel was not presented in that case, and while this court was considering that question upon rehearing, although not briefed, the petition for rehearing was withdrawn. The case at bar presents a broader and different principle of equity than presented in our former decisions. It is not only a question of whether the plaintiff herself is estopped by her acts, but whether the government is estopped from now contending that the act of Congress which plaintiff and the Secretary of the Interior proceeded under was repealed, and whether the act of Congress of June 21, 1906, gave the Secretary of the Interior authority to remove restrictions.

If this conveyance is in violation of section 19 of the act of April 26, 1906, and the restrictions upon this land have been transgressed by this transaction, then the Secretary of the Interior has authority in the name of the United States Government to maintain an action to set aside this conveyance. Such was the holding of the United States Supreme Court in the case of Heckman v. United States, 224 U. S. 413, 56 L, Ed. 820, and United States v. Noble, 237 U. S. 74, 59 L. Ed. 844. Not only could the Secretary of the Interior in the name of the United States maintain an action for this purpose, but the decree obtained in such an action would be binding upon the plaintiff, although she was not a party to the action. See Heckman v. United States, supra.

The management of Indian affairs and matters arising out of Indian relations has

for years been delegated by Congress to the Department of the Interior, and it has been its duty to construe the different acts of Congress, and to execute them as it construed them. The policy of the government toward the Indian as to his restrictions has been under the direct supervision of the Department of the Interior. This was a sale of plaintiff's land at her request, conducted at her request by the Department of the Interior and subject to its approval, in accordance with certain acts of Congress, as construed by the department. Could the Interior Department in the name of the United States successfully maintain an action, under these facts, to cancel this conveyance for the reason it was in violation of the restrictions imposed upon the land, or would the construction it placed upon the acts of Congress estop it from questioning the title when the sale was conducted by it and the property rights of innocent parties are involved?

In 5 Enc. of U. S. Supreme Court Reports, 925, it is stated:

"A party to a contract cannot pronounce his own deed invalid, although such party be a sovereign state."

On page 933, it is stated:

"The law of estoppel by deed applies against the government, and it cannot assert anything in derogation of its grant."

On page 1001, it is stated:

"In a proper case the doctrine of equitable estoppel applies against the government whether that of the United States or of the states."

In the case of Iowa v. Carr, 191 Fed. 257, the court stated as follows:

"The equitable claims of a state or nation appeal to the conscience of a chancellor with the same, but with no greater or less, force than would those of a private citizen, and, barring the effect of mere delay, they are judicable in a court of chancery, to whose jurisdiction the state or nation voluntarily submits them, by every principle and rule of equity applicable to the rights of private citizens under like circumstances."

In the body of the opinion the court stated as follows:

"They also contend that every sovereignty is exempted from the rule of equitable estoppel.

"But the great weight of authority, the stronger reasons and the settled rule upon this subject in the courts of the United States, is that, while mere delay does not, either by limitation or laches, of itself, constitute a bar to suits and claims of a state

or of the United States, yet, when a sovereignty submits itself to the jurisdiction of a court of equity and prays its aid, its claims and rights are judicable by every other principle and rule of equity applicable to the claims and rights of private parties under similar circumstances.

"The equitable claims of a state or of the United States appeal to the conscience of a chancellor with the same, but with no greater or less force than would those of an individual under like circumstances. United States v. Stinson, 197 U. S. 200, 204, 205, 25 Sup. Ct., 426, 49 L. Ed. 724; United States v. Detroit Timber & Lumber Co., 67 C. C. A. 1, 10, 131 Fed. 668, 677; United States v. Chicago, M. & St. P. Ry. Co. (C. C.) 172 Fed. 271, 276; United States v. Chandler-Dunbar Water Power Co., 152 Fed. 25, 26, 27, 37, 38, 40, 41, 81 C. C. A. 221, 222, 223, 234, 236, 237; United States v. Stinson, 125 Fed. 907, 910, 60 C. C. A. 615, 616; Herman on Estoppel, sections 676, 677; State of Michigan v. Jackson, L. & S. R. Co., 16 C. C. A. 345, 351, 69 Fed. 116, 122; State v. Flint & P. M. R. Co., 89 Mich. 481, 51 N. W. 103, 106; United States v. California & Oregon Land Co., 148 U. S. 31, 41, 13 Sup. Ct. 458, 37 L. Ed. 354; Carr v. United States, 98 U. S. 433, 438, 25 L. Ed. 209; United States v. Walker (C. C.) 139 Fed. 409, 411, 412, 413; United States v. Williamette Valley & C. M. Wagon Road Co. (C. C.) 55 Fed. 711, 717; Attorney General v. Central Railway Co., 68 N. J. Eq. 198, 59 Atl. 348."

The question of estoppel against the United States Government was discussed in the case of Titus v. United States, 20 Wall. 475, 22 L. Ed 400. In that case the United States was seeking to recover from Titus certain money paid to him by the agency of the government for informing against certain lands that had been used and employed as aid in the rebellion during the Civil War. Titus informed against the land under the confiscation act of August 6, 1861, and the Attorney General, in the name of the United States, brought proceedings to confiscate the land, obtained a judgment confiscating the same, and advertised and sold the land under that judgment. Titus was paid his part of the proceeds, as an informer. The government sought to recover back the proceeds paid to Titus, holding the land had been deeded to the Confederacy, and the act of August 6, 1861, did not apply to this class and character of land, but only applied to land used by private individuals, and not to the public property of the Confederacy. As to the validity of the proceeding condemning the land, the court said:

"An informer, to entitle himself to the statutory reward for his service, must inform against property which is the subject of judicial condemnation. There can be

nothing to divide if there is nothing to condemn. In this case the land, when informed against, was already the property of the United States. The title had passed by the completed conquest. There was nothing to reach by judicial process. Information, in the statutory sense, could do no good."

Titus pleaded the government was estopped, after confiscating the land and paying him his proceeds, from seeking to recover the same back. The Supreme Court held that the government was not estopped from maintaining the action against Titus. In discussing the question of the sale of the land under this judgment, which judgment was in fact a nullity, and whether the government would be estopped as against the purchaser at that sale, it used this language:

"Very different questions, and very different principles of estoppel, will have to be considered if the United States or the commissioner shall ever attempt to assert title against the purchasers at the sale. They claim under the sale, and have paid their money in consequence of the offer of the United States to sell in that way."

It would seem that if estoppel could ever be pleaded against the United States Government, the facts in this case warrant that plea. In the case of Heckman v. United States, Mr. Justice Hughes, speaking for the court, stated as follows:

"The restrictions were set forth in public laws, and were matters of general knowledge. Those who dealt with the Indians contrary to these provisions are not entitled to insist that they should keep the land if the purchase price is not repaid, and thus frustrate the policy of the statute." United States v. Trinidad Coal & Coking Co., 137 U. S. 160, 170, 171, 34 L. Ed. 640, 644, 11 Sup. Ct. Rep. 57.

The above case lays down the general rule and the reason for asserting the broad principle that equitable estoppel does not apply to restricted Indians when the sale of restricted lands is involved; but this general rule does not apply where the governmental agency whose duty it is to construe the acts of Congress, and which has general supervision over Indian matters, has construed the statutes to authorize a sale of the allotment upon approval of the Secretary of the Interior, and the department has conducted the sale, and the party who purchased acted in good faith and relied upon that construction. A different rule must apply to those persons who have dealt with the Indian and with the Department of the Interior in accordance with the construction the department has placed upon the acts of Congress from that applied to those parties who have

dealt with the Indian in violation of the construction placed upon the acts of Congress by the Interior Department. In the last class of cases the party is violating the policy of the government that was enacted to protect the Indian, and has failed to follow the construction placed upon the acts of Congress by the department. In the first class of cases the party is following the policy of the government and the construction placed upon the acts of Congress by the department whose duty it is to execute them. The fact that estoppel would not apply in the cases where the party has openly violated the policy of the government can be no reason nor even an authority to support the doctrine that when parties deal with the Indian through the Department of the Interior, and in accordance with its construction of the law, they should not be protected. It certainly was never intended by Congress that, when a restricted Indian applied to the Secretary of the Interior for permission to sell his land under the act of March 3, 1903, for town-site purposes, and by the joint action of the Indian and the Secretary of Interior made the sale in accordance with the provisions of the act of Congress, and received the fair value of the land, which was paid to the department, and with full knowledge upon the part of the Indian and the governmental agency that the purchaser would place the land upon the market for sale for town-site purposes, and the land would be improved and sold to the public for homes, that the Indian or the Secretary of Interior could stand idly by for 13 years and see valuable improvements placed upon the land, and then be heard to say: "Our construction of the act of Congress was wrong. We now seek to recover from you and your assignees the land, with all the improvements that you have placed thereon."

The Supreme Court of Washington, in the case of Little Bill v. Swanson, 117 Pac. 481, in the body of the opinion, used this language:

"Statutes of the United States providing for allotment of Indian lands and patents, with restrictions upon alienation, were enacted to protect Indians from schemes and fraudulent practices of white men, not to aid in the unconscionable and inequitable enforcement of stale claims, to the injury of innocent parties who in good faith, for value, and by regular procedure have purchased allotted Indian lands through the Interior Department of the United States."

The Supreme Court of the United States cited the above case in the case of Jacobs v. Pritchard, supra, although it made no

reference to the question of estoppel or to the language used.

The United States Supreme Court applied the doctrine of laches to an Indian where it would have been inequitable to have made a different application in the case of Felix v. Patrick, 145 U. S. 317. The court stated in substance: "That in view of all the circumstances, it would be inequitable to disturb the disposition made of the case below." The land had become a part of the city of Omaha, and, although the time intervening was 30 years, still the Indians seeking recovery were nonresidents of Nebraska and resided in Minnesota, and under tribal relations, and by reason thereof could not maintain an action in the federal courts for the possession of the land until 1887, or about the time of bringing the action, and although the transaction was coupled with fraud amounting to forgery, still the court said the land is now intersected by streets, subdivided into lots and blocks and largely occupied by purchasers who bought upon the strength of Patrick's title and erected buildings upon their property. The court, in the concluding paragraph of the opinion, says:

"The decree prayed for in this case, if granted, would offer a distinct encouragement to the purchase of similar claims, which doubtless exist in abundance through the western territories, and would result in the unsettlement of large numbers of titles upon which the owners have rested in assured security for nearly a generation."

In the case of United States v. Smith, 266 Fed. 740, it was said:

"It is a well-recognized rule for the construction of statutes that the terms employed by the Legislature are not to receive an interpretation which conflicts with acknowledged principles of justice and equity, if another sense, consonant with those principles, can be reasonably given to them, unless the expressed intent is so clear as to remove it from the domain of the application of rules of construction. This rule should also apply to legislation by Congress relating to Indians, when at the same time the expressed public policy of the government towards such wards is followed. Such policy is that such wards shall be under the direct supervision of the Department of the Interior".

The former opinions of this court are not in conflict with the views herein expressed, for the reason in all of those cases the transaction under consideration was one in violation of the express public policy of the government in dealing with the restricted Indian, while in the instant case the transaction was in accord with the public policy of the government and the transaction was conducted through the Department of the Interior, which has supervision and control over Indian matters. If the government would be estopped, then the plaintiff would be also, for the principle upon which the doctrine of estoppel does not apply to an Indian regarding her restricted land can have no application when the Department of the Interior, whose duty it is to supervise and control these Indian matters, has been the moving party in the sale of the Indian's land.

We, therefore, conclude:

First: That the act of March 3, 1903, was not repealed by the act of April 26, 1906.

Second: That the contemporaneous construction by the Department of the Interior of the act of March 3, 1903, and the act of April 26, 1906, and the act of June 21, 1906, was not manifestly incorrect, and no great public question, right, or interest is involved, and under the facts in this case that construction is binding on the court.

Third: That, under the facts in this case, plaintiff is now estopped by her deed from maintaining this action.

For the reasons stated, the judgment of the trial court is reversed, and the cause remanded, with instructions to dismiss plaintiff's petition.

All the Justices concur.