[No. 8135. Department One. November 6, 1909.]

THE CITY OF SEATTLE, *Respondent*, v. JAMES R. STIRRAT et al., *Appellants*.[1]

MUNICIPAL CORPORATIONS—POWERS—OFFICERS—LIABILITY OF CITY FOR MISFEASANCE—IMPROVEMENTS—FUNDS. In the matter of local improvement contracts, a city exercises proprietary or private functions as distinguished from governmental or public functions; and for this reason must answer for misfeasance of its officers and is responsible for money paid to the city comptroller under a long established practice or custom, and appropriated by that officer, although the charter provides for the payment of moneys into the city treasury; the moneys received for such improvements *not being* "moneys of the city" within the charter meaning of the term, especially where the indebtedness created for such improvements is a charge against the property and not a debt of the city.

[1]Reported in 104 Pac. 834.

Appeal from a judgment of the superior court for King county, Albertson, J., entered November 28, 1908, upon findings in favor of the plaintiff, after a trial on the merits before the court without a jury, in an action on contract. Reversed.

*C. A. Riddle* and *Peters & Powell*, for appellants.

*Scott Calhoun* and *Bruce C. Shorts*, for respondent.

CHADWICK, J.—This is an action brought by the city of Seattle against Stirrat & Goetz and the United States Fidelity & Guaranty Company, to recover the sum of $400. In making local improvements in the city of Seattle, certain preliminary expenses are incurred to cover cost of surveys, advertising, and a list of owners of property to be affected by the improvement, as well as all other expenses incidental to letting the main contract. The city advanced the money to meet these expenses from its general fund, and the amount so advanced is known as the "fixed estimate," and is charged against the proposed improvement to be thereafter laid against the property benefited, together with the actual cost of the work. To insure the repayment of this advance, the city requires that the amount thereof be repaid by the contractor.

In August, 1901, defendants Stirrat & Goetz were awarded a contract for the improvement of certain streets, all as provided by the terms of Ordinance No. 6,818, creating local improvement fund district No. 403, wherein it was provided that payment should be made by the issuance of local improvement bonds chargeable upon district No. 403. It was also provided that, from time to time as the work progressed, payments should be made, up to seventy per cent of the whole contract price. It was further expressly provided that no bonds or warrants should be issued in any event for the thirty per cent reserved, until Stirrat & Goetz should have paid in coin the par value of enough bonds or warrants to cover the initial cost advanced from the general fund, which in this case

was $400. The thirty per cent retained to cover possible liens etc., was, after a certain time, paid to Stirrat & Goetz, but it is now asserted by the city that the $400 due from them was never paid, and this action is brought to recover it. The admitted facts show that, during all the times the contract was under way, one John Riplinger was city comptroller of the city of Seattle, and that it was his duty to keep in charge and deliver the bonds to cover the "fixed estimates" to the contractor; that at the time Stirrat & Goetz received the thirty per cent balance due on their contract, they drew a check to the city comptroller, and received bonds to the par value of $400. A copy of the check and its endorsements follows:

$400.00                             No........

Seattle, Wash., March 24, 1902.

The Washington National Bank

United States Depository.

Pay to City Comptroller or order Four Hundred 00-100 Dollars. Final on Thirteenth Ave.

(Stamped on the face thereof)         Stirrat & Goetz.

PAID

R Apr. 17, 1902.

Washington National Bank

Seattle, Wash.

(Endorsed thereon)

Jno. Riplinger,

City Comptroller.

This money was never paid into the treasury by Riplinger, but, so far as the record in the present case shows, was appropriated to his own use. In July, 1907, the city made demand on Stirrat & Goetz for the payment of the $400, which being refused, this action was instituted against them and their bondsmen. The bond company defaulted, but to the complaint Stirrat & Goetz made answer, setting up various defenses, asserting that for a long time the mayor and council had, otherwise than by resolution or ordinance, put the matter of dealing with these "fixed estimates" under the exclusive direction and control of the comptroller; that the contract under which they operated required that the warrants re-

ceived by them in payment of the "fixed estimates" should be immediately indorsed payable to the city comptroller, and that such was the exclusive custom; that during twelve years they had, in all of a large number of contracts, been authorized, directed, and permitted to pay to the city comptroller the amount of the "fixed estimates," and that the custom prevailed with all other contractors; that the comptroller was the financial agent of the city, and it was his duty to keep and countersign all bonds issued by the city, and that the only manner in which a contractor for local improvements could obtain such bonds was to receive them from the comptroller, paying to him the excess of the moneys due to cover the "fixed estimate." They also plead other defenses, setting up the knowledge of the city of this custom during all the time intervening between the appropriation of the money by Riplinger and the commencement of this action; and by way of a further defense they plead an estoppel. Demurrers were sustained to the several defenses, and defendants have appealed.

It will be seen that the pith of this case lies in the legal authority of the comptroller to receive money from these appellants. The city contends, and the trial court held, that the duties of the comptroller and treasurer being defined by the city charter, and it nowhere appearing that the comptroller had any authority to receive any money for or on account of the city, and the contract having provided explicitly that the money for the "fixed estimate" should be paid into the city treasury, this case falls within that line of cases holding that one who deals with a public officer is charged with a knowledge of his duties, and the limitations upon his powers and authority, and cannot, by any act of his own, make the officer an agent of the public in any transaction, unless it is put upon him in virtue of some statute or the fundamental law; that the payment of money, if made to an officer who has no authority to receive it, is voluntary, and while there may be a moral obligation on the part of the person receiving it to pay it over to the proper custodian,

it is not a legal obligation, and that the agency, if any exists, is between the individuals, and the city is not bound. There are, of course, many cases holding to this rule, although it is not universal. It is most frequently invoked in embezzlement cases, of which respondent suggests the following: *Sherrick v. State,* 167 Ind. 345, 79 N. E. 193; *Hartford Fire Ins. Co. v. State,* 9 Kan. 210; *State v. Spaulding,* 24 Kan. 1, as decisive of this case. In the first of these cases—and it is but a type of all the others—it was held that money paid to a state auditor by insurance companies for license fees was not a payment to the state within the terms of the law that provided that all such moneys should be paid to the state treasurer.

Without committing ourselves to this doctrine—it may be admitted so far as this case is concerned—the question before us strikes deeper, and depends upon other considerations. It involves an inquiry into the authority and power of the city in the exercise of its several functions. A municipal incorporation possesses a two-fold character. It exercises under a grant or charter a part of the sovereign power of the state, but in thus exercising its power and to promote the ends of government and the convenience of its inhabitants, it may, and frequently does, act as an agent for the citizen.

"The distinction between these, though sometimes difficult to trace, is highly important, and is frequently referred to, particularly in the cases relating to the implied or common-law liability of municipal corporations for the negligence of their servants, agents, or officers in the execution of corporate duties and powers. On this distinction, indeed, rests the doctrine of such implied liability. In *its governmental or public character,* the corporation is made, by the state, one of its instruments, or the local depositary of certain limited and prescribed and political powers, to be exercised for the public good on behalf of the state rather than for itself. In this respect it is assimilated, in its nature and functions, to a county corporation, which, as we have seen, is purely part of the governmental machinery of the sovereignty which creates it. Over all its civil, political, or governmental powers, the

authority of the legislature is, in the nature of things, supreme and without limitation, unless the limitation is found in the constitution of the particular state. But *in its proprietary or private character*, the theory is that the powers are supposed not to be conferred, primarily or chiefly, from considerations connected with the government of the state at large, but for the private advantage of the compact community which is incorporated as a distinct *legal personality* or *corporate individual*; and as to such powers, and to property acquired thereunder, and contracts made with reference thereto, the corporation is to be regarded *quoad hoc* as a private corporation, or at least not public in the sense that the power of the legislature over it or the rights represented by it, is omnipotent." Dillon, Municipal Corporations (4th ed.), §66.

"In its governmental or public character, it represents the state, while in the other it is a mere private corporation. As a political institution, the municipality occupies a different position, and is subject to different liabilities from those which are imposed upon the private corporation. But because these two characters are united in the same legal entity, it does not follow that the shield which covers the political equally protects the private corporation." *Cincinnati v. Cameron*, 33 Ohio St. 336, 367.

See, also, 20 Am. & Eng. Ency. Law (2d ed.), 1131.

With reference to its first or governmental power, it acts strictly as a public corporation. It is held by its charter and cannot be bound by any act committed *ultra vires* by its officers. It is upon this principle that the cases of *Paul v. Seattle*, 40 Wash. 294, 82 Pac. 601, and *Arnott v. Spokane*, 6 Wash. 442, 33 Pac. 1063, must be held to rest. In the exercise of its proprietary or private functions, it is held to its private contracts, and is subject to estoppels as is any private corporation.

"When the municipality undertakes to supply, to those inhabitants who will pay therefor, utilities and facilities of urban life, it is engaging in business upon municipal capital and for municipal purposes but not in methods hitherto considered municipal. It is a public corporation transacting private business for hire. It is performing a function, not governmental, but often committed to private corporations

or persons, with whom it may come into competition. The
function may be municipal but the method is not. It leads
to profit, which is the object of the private corporation.
Some courts and authors therefore term the municipality in
this aspect a quasi-private corporation." 28 Cyc. 125.

The power to grade streets, lay sewers or water pipes, and
to lay the cost thereof upon abutting property is not a gov-
ernmental or public function in the strict sense. It has noth-
ing to do with the raising or disbursing of the public revenue,
with improvements which affect the whole public in like de-
gree, the preservation of the public health, or the exercise of
the police power. The method of doing such work is left to
the city, but in its exercise it neither receives or disburses
"public funds" or the "moneys" referred to in its charter.
It collects the tribute of the property owner paid, in theory
at least, voluntarily, and disburses it in such manner as it may
provide, so long as it does not contravene the general law.
It may, in the exercise of this function, provide by ordinance
or by a practice or custom long adhered to, notwithstanding
the provision in the particular contract, that the money so
collected may be paid into any depositary, a bank if it sees
fit, to be thereafter covered into the treasury by its agent.
The agency is not one growing out of the charter, but is
dependent upon the contract or conduct of the city. Nor is
it any answer to say that the work performed by appellants
was of general interest and benefit to the whole public.

"But the distinction is quite clear and well settled, and the
process of separation practicable. To this end, regard should
be had, not so much to the nature and character of the various
powers conferred, as to the object and purpose of the legis-
lature in conferring them. If granted for public purposes
exclusively, they belong to the corporate body its public,
political or municipal character. But if the grant was for
purposes of private advantage and emolument, though the
public may derive a common benefit therefrom, the corpora-
tion *quoad hoc*, is to be regarded as a private company."
*Bailey v. Mayor etc. of New York*, 3 Hill 531, 539.

See, also, *Hart v. Bridgeport*, 13 Blatchf. 289.

There is nothing in the general law to warrant the assumption that the sovereign power of the state is involved in grading streets for the benefit of private property. Certainly mandamus would not lie to compel it, nor would injunction lie at the instance of a citizen whose property was not immediately affected. The moneys received in aid thereof are not "moneys of the city" within the charter meaning of the term, but may be funds of the city within the terms of their contract, or in the sense that it is the duty of the city to collect and disburse them. It is only moneys raised by the operation of some general law that become "moneys of the city," or "moneys belonging to the city," or "public funds," or "public moneys," and subject to the charter provision with reference to their deposit. Such laws, whether they be general or special, can have no reference to such funds as may come to a municipality through methods with which the public as a whole has no concern. *State ex rel. Johnson v. Clausen.* 51 Wash. 548, 689, 99 Pac. 743, 101 Pac. 835.

"The term 'public money,' as used in the statutes of the United States, ordinarily means the money of the Government, received from the public revenues or intrusted to its officers charged with the duty of receiving, keeping, or disbursing the same wherever it may be. Such money, when illegally obtained therefrom, may be followed by the Government into the hands of the wrong-doer and recovered as a debt due from him, with the preference over other creditors in the distribution of his assets in case of insolvency given to the United States by statute. (*Bayne et al. v. The United States,* 93 U. S., p. 642. It does not include the money of states, counties, cities and towns, although with reference to those governments and municipalities such funds in other connections would be deemed public money. Nor does it include money in the hands of the marshals, clerks, and other officers of courts, held by them under authority of law to await the judgment of the court in relation to the ownership thereof. Such money constitutes trust funds held for individual litigants, and not for the public as represented by the Government." *Branch v. United States,* 12 Ct. Claims, 281, 289.

Our reasoning further finds assurance in the fact that indebtedness incurred for these purposes has been held to be no part of the general indebtedness or funds of a municipal corporation. If they were debts or funds within the meaning of the charter or constitutional definition of the term, it must have been held otherwise. It therefore seems plain that, in the execution of its trust, the city of Seattle might have contracted directly that the amount involved in this case could be paid directly to its comptroller; and, if it could, it is subject to such implications as the law throws around its persistent practice and continued conduct. While one paying "public funds" into the hands of the comptroller might pay at his peril, the act being *ultra vires*, the city must answer for the misfeasance of its officer who has assumed with its knowledge to perform a function incident to its proprietary character. This is especially so when we consider that the city charter expressly provides that the city comptroller "shall perform such other duties as this charter or the city council may direct."

The judgment of the lower court is reversed, with directions to let the case proceed in accordance with this opinion.

RUDKIN, C. J., FULLERTON, and GOSE, JJ., concur.