[No. 28828.   Department Two.   January 6, 1943.]

ARVID STRAND et al., Respondents, v. THE STATE OF
WASHINGTON et al., Appellants.[1]

'Reported in 132 P. (2d) 1011.

*The Attorney General* and *Lloyd W. Shorett,* for appellants.

*Croson, Johnson & Wheelon,* for respondents.

SIMPSON, J.—This suit was brought for the purpose of quieting title to tidelands located near the mouth of the north fork of the Skagit river. Plaintiffs, in their complaint, alleged title in the property, described as follows:

"All tide lands of the second class to the line of extreme low tide lying in front of Lots 5 and 6, Section 7, Township 33 North, Range 3 E.W.M., with a frontage of 61.40 lineal chains, more or less, measured along the Government meander line; also tide lands of the second class to the line of mean low tide measured along the Government meander line commencing at the North-

west corner of Lot 1, Section 18 in said Township and Range and running to a point which is two (2) chains westerly measured along said meander line from the Southeast corner of said lot 1."

The defendants answered by way of general denial, except that the state claimed an interest in the lands, and intended to classify the property as public shooting grounds under authority of chapter 165, Laws of 1941. Defendants then set out two affirmative defenses. The first one will not be considered, because no evidence was introduced to support it. In the second affirmative defense, defendants claimed that the land sold did not include "islands" lying in a northerly direction and down stream from the lots described in the complaint, for the reason that the islands were detached tidelands, the title of which was in the state of Washington, by virtue of the provisions of the state constitution, and have from time to time been leased as detached tidelands which were beyond the line of extreme low tide, and that no proper survey was made prior to the state's deed to plaintiff Einarsen.

Plaintiffs demurred to the defense, and, in the alternative, set forth a general denial of the allegations contained in defendants' answer, except to admit that the state's title was derived from the state constitution. They alleged further that plaintiff Einarsen did apply to purchase the property as attached tidelands; that the facts, upon which he based his right to purchase, were properly submitted to the state land commissioner before the sale was made; that he sold an interest to his coplaintiffs, who thereupon improved the property; that the state confirmed this title by a subsequent survey and by denying an application of third parties to purchase as detached tidelands in

1935; and that the defendants were estopped to make any claim to the property.

The case was tried to the court, and a decree entered in favor of plaintiffs quieting their title to the specific portion claimed by the state, designated in the decree as certain "islands or hummocks" lying in front of lots five and six, and leaving it to the parties to determine the description by metes and bounds by mutual agreement or by further proceedings, if necessary. Defendants have appealed from the decree, assigning error in granting plaintiffs a decree quieting title.

Inasmuch as the individual defendants, members of the state game commission and the land commissioner, are named in their official capacity only, we will refer to the state of Washington as the sole appellant.

At the trial, title to certain small areas of the tidelands was involved, which were referred to by the parties as "hummocks." The evidence, for the most part, pertained to, and the controversy mainly hinged on, the title and the character of one of these "hummocks," and it is apparently conceded that the title to this "hummock" will determine the title to all property involved in this controversy. The "hummock" is rectangular in shape, about forty acres in area, bounded on the northerly side by the Skagit river and on the easterly and westerly sides by sloughs which flow from the river in a southwesterly direction. It is disputed whether the fourth side is open to the tideflats beyond. Without diking, the whole area would be under water at high tide. The most southerly slough is called "Ben Slough," it being the one nearest the uplands. Northwest of Ben slough is the other, known as "Big Slough."

It is admitted by appellant that respondents' title depends upon the deed Einarsen secured from the

state in 1928, and that the deed on its face gave title to all attached tidelands in front of lots five and six. The court found that it was the intention of the parties to include the "hummock" as attached tidelands at the time the deed was executed.

It is the contention of the state that this "hummock" was, in fact, detached tidelands, and as such could only be sold after a proper survey and upon an acreage basis rather than by lineal frontage as with attached tidelands. The state further contends that, if the property was, in fact, conveyed as attached tidelands, it did not pass to the grantee, irrespective of its actual character at the time, for the reason that it had been leased previously as detached tidelands and could not be sold without a survey as required by law.

The state's claim is based on Rem. Rev. Stat., § 7797-123 [P. C. § 6334-133], which reads as follows:

"Any accretions that may be added to any tract or tracts of tide or shore lands heretofore sold or that may hereafter be sold, by the state, shall belong to the state and shall not be sold or offered for sale until such accretions shall have been first surveyed under the direction of the commissioner of public lands, and the owner of the adjacent tide or shore lands shall have the preference right to purchase said lands produced by accretion for thirty days after the owner of the adjacent tide or shore lands shall be notified by registered mail of his preference right to purchase such accreted lands."

October 24, 1927, Einarsen purchased the tidelands in front of lots five and six from Skagit county. In the deed from the county, they are described as follows:

"Tide lands of the second class described as follows: Beginning on the meander line at the Northeast corner of Lot 5 of Section 7, Twp. 33, N. R. 3 E.W.M. thence running westerly and southerly along the meander

line to a point on said line which is two chains westerly, measured along the meander line, from the Southeast corner of Lot 1, Section 18, Twp. 33 N.R. 3 E.W.M."

In the month of May, 1928, Einarsen filed an application with the commissioner of public lands to purchase the second-class tidelands in front of lots five and six, lying between mean low tide and extreme low tide. His purpose evidently was to be certain that he would get a good title to the "hummock."

Second-class tidelands are described as follows:

"Whenever used in this act the term 'second class tidelands' shall mean public lands belonging to the state over which the tide ebbs and flows outside of and more than two miles from the corporate limits of any city, from the line of ordinary high tide to the line of extreme low tide." Rem. Rev. Stat., § 7797-6 [P. C. § 6334-16].

This statute was applicable in 1928 when Einarsen obtained his title.

Detached tidelands are defined in Rem. Rev. Stat., § 7797-122 [P. C. § 6334-132]:

"Tide or shore lands of the second class which are separated from the upland by navigable waters, shall be sold at not less than five dollars per acre; an applicant to purchase such tide or shore lands shall, at his own expense, survey and cause to be filed with his application a plat of the surveys of the land applied for, which surveys shall be connected with, and the plat shall show, two or more connections with the United States survey of the uplands, and the applicant shall also file the field-notes of the survey of said land with his application. The commissioner of public lands shall examine and test said plat and field-notes of survey, and if found incorrect or indefinite, he shall cause the same to be corrected or may reject the same and cause a new survey to be made."

Einarsen testified that, when he inquired at the land commissioner's office concerning the procedure to pur-

chase the tidelands he desired to buy, he was told that he must secure an engineer's report and a survey showing the original meander line. Accordingly, he filed an application which was accompanied by an affidavit signed by the county engineer of Skagit county, together with a survey showing the original meander lines of lots five and six. The affidavit stated that no slough existed on the property; that the "old slough" had "entirely filled up and no longer existed." This, it seems to be admitted, is not an accurate statement, as Einarsen testified there always had been some water in the sloughs, although he refers to them as "pot holes."

The chief engineer of the land commissioner's office thereafter made a report based, apparently to a certain extent, on the information furnished by Einarsen and the records in the office, which disclosed the history of the property pertaining to previous leases of part of the property as detached tidelands.

Thereafter, the proper statutory steps were taken, the sale consummated to Einarsen, and a deed executed by the proper state officials, conveying to him all the second-class tidelands "owned by the state of Washington between the line of mean low tide to the line of extreme low tide and in front of lots five and six." The grantee paid the sum of $307 to the state for this property, which was the appraised value placed thereon by the state based on a per lineal chain frontage measured along the government meander line.

The other respondents in this case acquired their interest in the property by a deed from Einarsen, and all of them have been in possession of the property since the date of their respective deeds.

Sometime during the year 1930, respondents drove piling around that portion of the property which they wished to retain for their exclusive use. Some of the

piling were driven across the sloughs, and these were later removed at the request of the war department. In 1930, respondents placed a dike around the "hummock," and erected a small house on it at a cost of approximately one thousand four hundred dollars, which they used mainly as a duck club. They made other improvements at the time, including the building of shooting blinds on this and other parts of the tide flats they claimed. It appears that the property has been used exclusively for recreational purposes, mainly for hunting by the respondents and their friends.

The right of possession of this property has never been questioned except that in 1934 a party not involved in this suit applied at the land commissioner's office to purchase or lease the "hummock" as detached tidelands. An investigation was made upon the request of the then land commissioner, and an engineer who had been employed in that office for many years was sent out to go over the property and make a report as to its character. As a result of the report by the engineer, the application was rejected sometime in February, 1935.

In 1941, the legislature passed an act known as chapter 165, which designated the tidelands in front of section 7 as public hunting grounds and withdrew them from sale as public lands. By authority of this act, the game commissioner attempted to classify the property as public hunting grounds and to post it as such. This suit was a result of the action of the game commissioner. It is admitted that the property is properly included in that designated by the legislature for public hunting if respondents do not have a valid title to it.

We will consider first the question of estoppel presented by the pleadings and respondents' brief. Respondents will definitely suffer an injury should the

state's contention prevail in this action. Their title is entirely the result of the action of the state, in determining the character of the tidelands at the time of the sale.

It is our opinion that the principle of equitable estoppel applies and precludes the state, at this late date, from claiming that its officials made a mistake in 1928 and that the land must revert to the state on that account. Respondent Einarsen, the grantee in the 1928 deed, relied on the acts and representations of the state officials that he had taken the proper steps and had done all that was necessary to obtain title to the property involved in this action.

"Estoppel by misrepresentation, or equitable estoppel, is defined as the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person who in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right either of contract or of remedy. This estoppel arises when one by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts. It consists in holding for truth a representation acted upon, when the person who made it, or his privies, seek to deny its truth, and to deprive the party who has acted upon it of the benefit obtained. When a party unjustly contrives to put another in a dilemma and to subject him to necessity and distress and he acts one way, it is not for the wrongdoer to insist that he should have acted another way." 21 C. J. 1113, § 116.

*Brown v. Baruch,* 24 Wash. 572, 64 Pac. 789; *Carruthers v. Whitney,* 56 Wash. 327, 105 Pac. 831; *Rowe*

*v. James,* 71 Wash. 267, 128 Pac. 539; *Morris v. Hillman Inv. Co.,* 99 Wash. 276, 169 Pac. 837; *Reynolds v. Travelers Ins. Co.,* 176 Wash. 36, 28 P. (2d) 310; *Bennett v. Grays Harbor County,* 15 Wn. (2d) 331, 130 P. (2d) 899.

In *Rowe v. James,* just cited, this court said:

"The basis of all estoppel *in pais* is that there is one innocent party and one negligent or wrongdoing party, and the doctrine means that, when the innocent party has been induced to surrender a valuable right or to change his position to his prejudice relying upon the acts or representations of the negligent or wrongdoing party, then the latter will not be heard to assert the falsity of his acts or representations to the prejudice of the former."

May the doctrine of equitable estoppel be applied as against the state when the state sells its tidelands?

■ The state acts in two capacities: governmental and proprietary. The distinction between the two is best stated in *Cincinnati v. Cameron,* 33 Ohio St. 336, approved by this court in *Seattle v. Stirrat,* 55 Wash. 560, 104 Pac. 834, 30 L. R. A. (N.S.) 1275:

"In its governmental or public character, it represents the state, while in the other it is a mere private corporation. As a political institution, the municipality occupies a different position, and is subject to different liabilities from those which are imposed upon the private corporation. But because these two characters are united in the same legal entity, it does not follow that the shield which covers the political equally protects the private corporation."

■ This court has held that the acquisition and sale of real property through tax foreclosure sales are governmental functions. *Sasse v. King County,* 196 Wash. 242, 82 P. (2d) 536; *Commercial Waterway Dist. No. 1 v. King County,* 197 Wash. 441, 85 P. (2d) 1067; *State ex rel. King County Water Dist. No. 22 v. Stacy,*

10 Wn. (2d) 248, 116 P. (2d) 356; *Bennett v. Grays Harbor County, supra.*

It has generally been recognized by this court that the doctrine of equitable estoppel would apply against the state when acting in its proprietary capacity. *Seattle v. Stirrat, supra; State ex rel. Washington Paving Co. v. Clausen,* 90 Wash. 450, 156 Pac. 554, L. R. A. 1917A, 436; *State v. Carlyon,* 166 Wash. 498, 7 P. (2d) 572; *Great Northern R. Co. v. Washington Electric Co.,* 197 Wash. 627, 86 P. (2d) 208; *Eagles v. General Electric Co.,* 5 Wn. (2d) 20, 104 P. (2d) 912.

It is the accepted rule that a state acts in its proprietary capacity when it undertakes to dispose of public lands. This rule has been recognized almost since the inception of the principle of equitable estoppel. *United States v. California & Oregon Land Co.,* 148 U. S. 31, 37 L. Ed. 354, 13 S. Ct. 458; *United States v. Dalles Military Road Co.,* 148 U. S. 49, 37 L. Ed. 362, 13 S. Ct. 465; *United States v. Willamette Val. & C. M. Wagon-Road Co.,* 54 Fed. 807; *State of Michigan v. Jackson, L. & S. R. Co.,* 69 Fed. 116; *United States v. Stinson,* 125 Fed. 907; *State of Iowa v. Carr,* 191 Fed. 257; *Attorney General v. Central R. Co.,* 68 N. J. Eq. 198, 59 Atl. 348; *State v. Flint & P. M. R. Co.,* 89 Mich. 481, 51 N. W. 103; *State v. Livingston,* 164 Iowa 31, 145 N. W. 91; *State v. Cording,* 101 Neb. 243, 162 N. W. 652; *Crosbie v. Partridge,* 85 Okla. 186, 205 Pac. 758; *State v. Horr,* 165 Minn. 1, 205 N. W. 444; *State ex rel. Shell Oil Co. v. Register of State Land Office,* 193 La. 883, 192 So. 519.

The case of *Attorney General v. Central R. Co., supra,* involved title to certain tidelands on Staten Island. The state contended that title to a portion of the property conveyed was an extension of a street and had been erroneously included in the description in the deed from the state. The railroad company had, as

required by the state, furnished a map of the property when applying to purchase. The map did not show the street extending within the tidelands which the company sought. The court held that the state was estopped from questioning the railroad company's title, after having allowed it to remain in possession several years and until the parties involved in the transaction were unavailable.

In *State v. Horr, supra,* the state entered into a compromise settlement of a claim of fraud against defendant involving purchase of timber. After the settlement, the state instituted action for the difference between the amount paid by defendant and the amount the state claimed was the entire sum due under the original demand. The court held the state was estopped to make the claim, and in passing upon the question said:

"The claim that the state now acts in this suit in its sovereign capacity is without support in principle. The state holds title. It is the proprietor of these lands. It has dominion over them. It administers them. Out of this administration an alleged claim has arisen, and the state has come into court to enforce that claim. What it is required to do with the money received is not the question. The prosecution of this suit is not an attribute of sovereignty. It is an attempt to enforce a claim in which the state puts itself on the plane of the ordinary citizen who does likewise. In so doing it submits to the jurisdiction of the court as though it were an individual and in a limited measure is subject to judicial control. We hold that in the prosecution of this action the state is acting in its proprietary capacity and not in its sovereign capacity."

And, then applying the principle of estoppel, said further:

"We ordinarily look to the action of the state to be characterized by a more scrupulous regard to justice than belongs to the ordinary person. The state is

formed for the purpose of securing for its citizens impartial justice, and it must not be heard to repudiate its solemn agreement, relied on by another to his detriment, nor to perpetrate upon its citizens wrongs which it would promptly condemn if practiced by one of them upon another."

It is true, of course, that, regardless of the capacity in which the state acts, whether proprietary or governmental, the principle of estoppel will not apply to unauthorized or *ultra vires* acts of state officials. *Gehr v. Ferry County,* 179 Wash. 68, 36 P. (2d) 71; *Brougham v. Seattle,* 194 Wash. 1, 76 P. (2d) 1013; *Bennett v. Grays Harbor County, supra.*

In this case, the duly authorized officials of the state executed a deed to Einarsen which was plainly intended to convey the property involved as attached tidelands, after having determined that the lands were in fact attached. The determination of this question was within the line of duty of the state's officials. In fact, the commissioner was the sole person entitled to determine this question, and the fact that he delegated certain administrative duties to subordinates did not make the decision less his responsibility.

If the commissioner or his subordinates erred in determining the lands as attached, the state should not have the right many years later to come into a court of equity and set aside the acts of its officials, to the irreparable injury of the citizens who acted in good faith and relied upon the assumption that the commissioner knew what he was doing. *State ex rel. Washington Paving Co. v. Clausen, supra; Eagles v. General Electric Co., supra; Walker v. United States,* 139 Fed. 409; *Ritter v. United States,* 28 F. (2d) 265.

Actual knowledge of the state's officials of the falsity of their representations was not necessary. It was their duty and responsibility to investigate and determine

the nature of tidelands. The statute, as we have already indicated, placed that duty on the land commissioner. Rem. Rev. Stat., § 7797-76 to § 7797-125 [P. C. § 6334-86 to § 6334-135], inclusive.

The evidence showed that the state did make an investigation of the situation, and was well aware of the fact that these tidelands had previously been designated as detached, and leased as such. There is every reason to believe that the land officials acted with full knowledge of the facts, but, if they did not, the state is none the less estopped to deny respondents' title in this action, as it was clearly the responsibility of the state officials to determine what the facts were with regard to the property, and the purchaser was bound by their decision with only the right of appeal to the courts if dissatisfied.

"Ordinarily, actual or imputed knowledge of the material facts by the person claimed to be estopped, at the time of his acts, declarations, or conduct relied on as giving rise to the estoppel, is essential to an equitable estoppel. It is sometimes said that actual knowledge of the facts is necessary; but generally it is not considered indispensable that the knowledge should be actual if the circumstances are such that a knowledge of the truth is necessarily imputed to the party sought to be estopped, or if he has actively and recklessly interfered to the prejudice of another; and it is recognized that culpable or inexcusable negligence in not knowing the facts may be the equivalent of actual knowledge for the purpose of an estoppel." 31 C. J. S. 266, § 70.

A situation similar to the one under consideration was present in *State ex rel. Shell Oil Co. v. Register of State Land Office, supra.* In that case, the state questioned the right of an oil company to certain portions of the tidelands deeded to the company. The contention was advanced that the irregularities relied on to avoid the oil company's title were not known to the

registrar of state lands. However, the court held that it was the duty of the official to attend to the details of the transaction; that the state was bound as though the facts were fully known to the officials; and that the knowledge of the facts would be imputed to the state's representative. In passing, the court said:

"In the lower court, the Attorney General contended that estoppel should not apply because the Register of the State Land Office did not have actual personal knowledge of the irregularities now complained of at the time she received the rental payments referred to above.

"Nevertheless, it appears from the statement of facts that clippings from the country newspapers were sent to her office with bills for their publication. We are, therefore, of the opinion that knowledge should be imputed to her, for these bills were received in her office by her subordinates in the regular course of affairs. It was her duty to see to it that the offerings of leases were properly advertised and, in addition, she was charged with the responsibility of seeing that the advertisements were correct before she paid for them.

" 'Knowledge of the truth as to the material facts represented or concealed is generally indispensable to the application of the doctrine of equitable estoppel. . . . It is not, however, indispensable that the knowledge should be actual if the circumstances are such that a knowledge of the truth is necessarily imputed to the party sought to be estopped.' "

Accord: *Cole v. Atlanta Life Ins. Co.,* 23 Tenn. App. 525, 134 S. W. (2d) 912; *Stone v. C. I. T. Corporation,* 122 Pa. Super. Ct. 71, 184 Atl. 674.

This brings us to the contention of the state that Einarsen did not act in good faith in securing his deed from the state. The argument is based upon the fact that the affidavit of the engineer employed by Einarsen at the time he filed his application to purchase was not correct in his statement that the slough had "dried up." The engineer employed was then

county engineer for Skagit county, and it may well be that, in his examination, he made an honest mistake and considered this slough "pot holes," as named by Einarsen when he was testifying.

In any event, we are unable to find that there was any intention on the part of Einarsen to deceive the state. Mr. Dohm, the chief engineer of the state land office, made a full and complete report at the time, which may have been based, in part, on the information furnished by Einarsen. However, the evidence showed that the state had abstracts and records of this property, and that Mr. Dohm was a man of many years experience and entirely familiar with the situation of the tidelands of this state.

As indicating that the state officials were fully aware of the situation then present, we refer to the testimony of Mr. Frank O. Sether, who testified as follows:

"Q. Mr. Sether, you were the secretary for the Land Commissioners? A. Secretary of the Board of State Land Commissioners. Q. Secretary of the Board of State Land Commissioners. From what time to what time? A. From 1921 to 1941 with the exception of a period in about 1933. . . . Q. Mr. Sether, will you just tell us now when an application comes in to you what do you do? You are the secretary. Now does it come to your hands? A. When an application comes into the office if it affects, if it covers tidelands when it comes in with the proper depositions it goes to the engineering department for an official writing such as that report you referred to here made by Mr. Dohm. When that report has been completed, which is a report of the condition as shown on the office records and from what information is turned in with the application, as soon as that engineer's report is made it is turned over to a field examiner who goes out and looks over the property and when his report comes back then that complete file is turned over to me by the engineering department. Q. Is that the policy which was followed in 1928? A. It was the policy that was followed at that

time. Q. And that was the procedure? A. Yes. . . .
Q. All you have said would be applicable to Mr. Einarsen's application? A. That is right."

In the case of *Attorney General v. Central R. Co.,*
*supra,* to which we have already referred, the railroad
was accused of bad faith in submitting a map with its
application which did not show the correct situation in
so far as the street was concerned. The deed did not
exclude the street which the state claimed. The court
said:

"It would not be either safe or reasonable to assume
that the grant was made solely upon information as to
the location of the highway supplied by the map, and
without making such further examination and inquiry
as the interests of the state and of the public required."

We hold that the deed was acquired in good
faith by Einarsen, and that, having allowed Einarsen
and the other respondents to go upon the land, make
expensive improvements, and pay the taxes for a number
of years, the state is estopped to deny respondents'
title.

Another reason or holding in favor of respondents
is that the questioned property is a portion of the
attached tidelands.

The answer to the problem is whether Ben slough
is navigable. In considering the question, we have in
mind that "Each determination as to navigability must
stand on its own facts." *United States v. Utah,* 283
U. S. 64, 75 L. Ed. 844, 51 S. Ct. 438.

The evidence relative to the condition of Ben slough
in 1928, and at the time of the trial, was somewhat contradictory. Respondents' witnesses testified that at low
tide a person could walk over all of the land in front of
lots five and six to a distance of several miles in one
direction and could, by avoiding "pot holes," walk
across the channel. As one witness stated in speaking

of the slough, "it dies out against the formation of sand and dirt; approximately 200 yards into the slough, and then you can walk right across there."

At another time, he testified:

"Q. Now, Mr. Strand, at extreme low tide, taking a point up to practically the corner of this Section Seven, being the northwest corner, at extreme low tide, would you have any trouble at all walking around there over the portion shaded light yellow? A. Oh, no; just the same as the floor. Q. Could you, then, from this point, walk along across the sloughs and come directly to your club house? A. Yes. I have done it many times. Q. Was that the condition that existed when you first came on the property? A. Yes. Q. When were you first on the property? A. Well, I have been down there quite a few years. I used to go down there in 1926, I used to hunt there. Q. That was the condition that existed there then? A. Yes. Q. The condition that you have described was the condition existing there in 1926? A. Yes. When I go down there, I walk back and forth. Q. And practically that same condition exists today? A. Yes, just about. Oh, there is a little variation, but not much."

Other witnesses testified that there was a continuous flow of water through the slough to the south in 1928 and that it was used by small boats of various kinds at high tide.

The trial judge stated, at the close of the trial:

"Now the testimony is that no freight boats ever used this slough, Ben's Slough; that no tug boats ever used it except to go down on occasion when a log or two broke loose and bring it back into the load of logs which they were transporting; that tugs with deeper drafts could not use it at low tides; that no one used it but fishermen or those who wanted to use a small row boat or skiff, something of that type, to go out to the bay. The witness Johnson, a fish buyer who testified, said that he used it on occasion to take a load of fish to Seattle because it was a shorter route but

he testified that at lower low tide. he could not do so even as early as 1922.

"So it seems to me when we determine whether this channel in 1928 could be used to a reasonable extent in the carrying on of commerce in the usual manner, considering depth and the fact that at extreme low tide, according to the evidence, it was very shallow in numerous spots, and that although in places there were pools and it was deeper and although there may even have been continuous water from the standpoint of actually seeing water, yet in no sense of the word can one say that in 1928 it was navigable as I understand the definition of navigability as laid down by our Courts. On the contrary there is testimony it could not be used for commerce except at higher tides and then only by a boat transporting fish."

It is admitted that the title of the state in all the tidelands as well as the beds and shores of navigable waters was acquired on admission of the state into the Union and vested in the state by virtue of Art. XVII, § 1, of our state constitution.

Through a long line of cases we have held that the term "navigable" or "navigability," as the words are used within the contemplation of our constitutional provision, is such as is "capable of being used practically for the carriage of commerce." *Griffith v. Holman*, 23 Wash. 347, 63 Pac. 239, 83 Am. St. 821, 54 L. R. A. 178; *Watkins v. Dorris*, 24 Wash. 636, 64 Pac. 840, 54 L. R. A. 199; *Dawson v. McMillan*, 34 Wash. 269, 75 Pac. 807; *Wilson v. Prickett*, 79 Wash. 89, 139 Pac. 754; *State ex rel. Davis v. Superior Court*, 84 Wash. 252, 146 Pac. 609; *Neterer v. State*, 98 Wash. 635, 168 Pac. 170; *Proctor v. Sim*, 134 Wash. 606, 236 Pac. 114; *Groeneveld v. Camano Blue Point Oyster Co.*, 196 Wash. 54, 81 P. (2d) 826; *Diking Dist. No. 2 v. Calispel Duck Club*, 11 Wn. (2d) 131, 118 P. (2d) 780.

Appellant contends for a different definition of the word "navigable," and cites in support of its argument,

*Dawson v. McMillan, supra; Judson v. Tide Water Lbr. Co.,* 51 Wash. 164, 98 Pac. 377; *State v. Scott,* 89 Wash. 63, 154 Pac. 165; and *United States v. Appalachian Electric Power Co.,* 311 U. S. 377, 85 L. Ed. 243, 61 S. Ct. 291.

In the *Dawson* case this court held a slough navigable which was used by boats and for towing logs at high tide, though it contained only four to twenty-four inches of water at low tide. A reference to finding two of the trial court, quoted and adopted in the opinion, reveals a factual situation distinctly different from that in the instant case. In order to point out the different situation, we quote from that part of the findings, which refers to the slough that was under consideration, as follows:

". . . said slough extends back in length about four miles from the mouth of said slough through sections 21 and 22; and that there is a channel, the same being well defined and about three to four feet in depth, extending from the mouth of said slough out into said Bellingham Bay for a distance of one and one-half miles; that said channel is from 70 to 100 feet in width, and that down this channel there is constantly flowing a channel of fresh water averaging during the year from 4 to 24 inches in depth at the deepest, and from 20½ feet to 40 feet in width; that twice each day the tide ebbs and flows up said channel and slough and over portions of the tide flats to a depth of from 7 to 9 feet, and which tide covers all the flats surrounding said slough; that, while the said tide is in, and while so flowing and ebbing, the said channel and slough is navigable, and has been and can be used as a public highway for boats, scows, and other ordinary modes of water transportation for general commercial purposes, and especially for the rafting, booming, and floating, and towing logs up and down the same; that said slough has been so used for at least twenty years prior to the time of the commission of the acts complained of by plaintiffs in their complaint."

The *Judson* case involved the rights of a riparian owner to have a river flow in front of his premises in its natural channel. The *Scott* case presented a question whether or not a "pot hole," which was below the line of extreme low tide, was conveyed by a deed from the state.

In the *Appalachian Power Company* case the court held, in effect, that a stream was navigable which, although not navigable in its natural state, could be made so by artificial means. The court, however, restricted the application of the rule to cases arising under the commerce provision of the United States constitution, and also limited its application to instances where improvements could be made that would be reasonable and practical, and specifically excluded cases involving title and riparian rights. The distinction made in the case itself makes it inapplicable to the facts under consideration.

Another reason why this definition of navigability will not apply is that there was no evidence as to what artificial means, if any, could be employed to make the slough navigable.

This court has time and again made a distinction of "navigability," as used in Rem. Rev. Stat., § 8407 [P. C. § 4560], creating logging highways, as an exception to the general definition of navigable waters. This was first brought out in *Watkins v. Dorris*, 24 Wash. 636, 64 Pac. 840, in which this court stated:

"If the stream is not meandered, it must then be determined whether it is or is not navigable in fact for floating logs or timber. If navigable for such purpose, it is a public highway for that purpose. The court finds Elochoman creek to be a short stream, eighteen miles in length, with an average width of one hundred feet, and a depth of about three feet, and that the stream can, during annually recurring freshets, be used profitably for the floating of logs

to the Columbia river to market, and that it has been so profitably used for the last twenty-five years. The stream must therefore be held to be a public highway for the purpose of floating logs and timber to market. Being a public highway for such purpose, what are the relations of the land owner to the stream? Thomas Dorris is the owner of the land on both sides of the stream. If such a stream as this is included in the provisions of § 1, art. 17, of the constitution of Washington, then the state is the owner of the bed of the stream below ordinary high water mark. We do not believe, however, that the said constitutional provision was intended to include streams of the character of this one, but only such as are navigable for general commercial purposes. This stream is of such a character that its use as a public highway is restricted to one purpose, viz., that of floating logs or timber; and we think a distinction must be drawn between such streams and those which are highways for general trade and commerce."

See, also, *Monroe Mill Co. v. Menzel,* 35 Wash. 487, 77 Pac. 813, 102 Am. St. 905, 70 L. R. A. 272; *State ex rel. Davis v. Superior Court,* 84 Wash. 252, 146 Pac. 609; *Proctor v. Sim,* 134 Wash. 606, 236 Pac. 114; *Diking Dist. No. 2 v. Calispel Duck Club,* 11 Wn. (2d) 131, 118 P. (2d) 780.

It is apparent that Ben slough is not a navigable stream according to the rule adopted by this court in defining that term as generally used. Assuming that the court could find that there was a continuous flow of water from the slough to the south, it is apparent that this so-called channel was meager and could not by any stretch of the imagination be said to be useful for navigation in a commercial sense.

The state's contention that the war department's request of respondents that they remove certain piling in the slough established navigability of the slough is not well taken. Neither the request of the department nor respondents' compliance there-

with, gave rise to an inference of navigability of the slough.

In *Oklahoma v. Texas*, 258 U. S. 574, 66 L. Ed. 771, 42 S. Ct. 406, the contention was likewise made that in securing a license from Congress to build certain bridges, which when secured provided there would be no interference in navigation, gave rise to an inference of navigability. The court said:

"A like inference is sought to be drawn from the fact that Congress, in permitting the construction of certain bridges across the river within Oklahoma, provided in substance that there should be no interference with navigation. But it is reasonably manifest that this provision was only precautionary and not intended as an affirmation of navigable capacity in that locality. The river was known to be navigable from its mouth to near the eastern boundary of Oklahoma and there had been, as will be seen presently, some light navigation above that boundary in the irregular times of temporary high water; so those who were about to construct the bridges at large expense deemed it prudent to secure the permission of Congress, and Congress merely took the perfectly safe course of qualifying its permission as indicated."

Appellant's contention that a deed could not be given to include the "hummock" as attached tidelands without a survey is not well taken. Rem. Rev. Stat., § 7797-123, in force at the time Einarsen secured his deed, has no application. The accretion, such as it was, occurred while the property was owned by the state. The statutory provision to which we have just referred applies only to instances where the accretion occurs after the state has divested itself of title. The provision appellant attempts to construe as applicable only means, as the language clearly indicates, that the statute applies in those instances where the state has deeded the property either before or after the

130

passage of the act and the accretion occurs after such transfer.

We hold that the state intended to convey its title to Einarsen in 1928 when he secured his conveyance to all the tidelands between mean low tide and extreme high tide in front of lots five and six, and that by the deed the state divested itself of all claim to the "hummock" and that respondents were entitled to a decree quieting their title.

The decree in favor of respondents is affirmed.

ROBINSON, C. J., BEALS, and BLAKE, JJ., concur.