[No. 30213. Department One. October 23, 1947.]

GRACE EVELYN JAMES, as Administratrix, Appellant, v.
CHRIST CHURCH PARISH et al., Respondents.[1]

[1]Reported in 185 P. (2d) 984.

■■■■■■■■■
■■■■■■■■■
■■■■■■■■■

*Peyser, Bailey & Cartano, Schneider & Helm,* and *Copass & Hall,* for appellant.

*Bayley, Fite, Martin & Shorts,* for respondents.

SIMPSON, J.—Plaintiff, as administratrix of the estate of Paul B. James, deceased, instituted this action to recover from defendants the sum of $18,566.36 as salary earned by Paul B. James during a period of time he acted as rector of Christ Church Parish. Defendants set up the affirmative defenses of modification of the contract, the statute of limitations, waiver, and estoppel.. During the progress of the trial, defendants admitted that they were indebted to the estate in the sum of $1,698.68. The case, tried to the court sitting without a jury, resulted in the entry of a judgment in the sum of $1,698.68.

Plaintiff has appealed and has assigned as error, findings Nos. 5, 6, 7, 8, and 10, the conclusion of law in paragraph No. 1, and refusal to enter judgment for the amount claimed in the complaint.

The facts may be summarized as follows: Christ Church Parish is a parish of the Protestant Episcopal Church, located in Seattle, Washington, and is a part of, and under the authority of, the diocese of Olympia. The governing body of the parish is called a vestry. The defendant Christ Church Parish of Seattle is a nonprofit corporation organized and existing under the laws of the state of Washington, the business affairs being managed by a board called the vestry, which is identical with the vestry of Christ Church Parish, and exists in order that there may be a legal entity to hold title to property for the parish. The church is governed by

the canons of the diocese of Olympia, of the Protestant Episcopal Church in the United States of America, among which is the following:

"The call of the Rector-elect shall be in writing, and shall express distinctly any special conditions, together with the stipulation as to salary and support, which call when accepted, and when the Clergyman is settled, shall be a legal contract; Provided, that the salary named in the call may, by agreement in writing signed by the parties, be increased or diminished from time to time."

The rector acts as chairman of all vestry meetings.

January 16, 1922, Christ Church Parish called Reverend Paul B. James to be its rector. The call was in writing and provided that his salary should be three thousand dollars per year, with the further agreement that at least twenty-five dollars per month would be paid toward the rent of a rectory. An additional agreement provided that, if receipts of the church warranted it, the parish was to pay the entire parish rent of fifty dollars per month. The call was accepted by Reverend James in writing, January 20, 1922. Thereafter, he served as rector until his death, September 1, 1942.

Prior to the call, the diocesan council of the Protestant Episcopal Church had agreed to contribute to Christ Church Parish for work among the University of Washington students, the sum of one thousand dollars per year. This sum was contributed until March 31, 1928, when it was discontinued. Reverend James, before accepting the call, was advised of such contribution, and had notice and knowledge of its discontinuance.

During the economic depression, the parish became financially unable to comply with the terms of the contract. The rector received his entire salary until January 1, 1928. During that year, pension payments were computed on the basis of twenty-three hundred dollars. During 1929, 1930, 1931, and 1932, pension payments were based on a salary of thirty-three hundred dollars. After the thousand-dollar payment was discontinued in 1928, the church continued to attempt to pay the full salary of thirty-three hundred dollars. In

November, 1932, the church was $1,500.26 in arrears in the rector's salary.

A reduction of salary was discussed at a meeting of the vestry on May 10, 1932, and the rector agreed to a salary reduction, if required by future church income. At a vestry meeting November 7, 1932, Reverend James announced that, in accordance with his previous understanding with the vestry, his salary would be only such amount as the parish was able to pay. He also announced that he had formally written off the unpaid portion of his stipend by endorsing back to the parish a check in the sum of $1,218.26, thus leaving the parish without any debt owing to him. The vestry approved the rector's action. Apparently another check had been endorsed back to the vestry in the sum of $282.

At a meeting of the vestry November 22, 1932, a resolution was passed reducing the rector's salary to one hundred dollars per month, beginning November 1, 1932, and extending until May 31, 1933. The rector gave his consent to the resolution and voted affirmatively on the motion. At a vestry meeting May 1, 1933, the resolution of November 22, 1932, in regard to the rector's salary, was extended until January 1, 1934. This was done upon the motion of Reverend James. At a meeting held January 29, 1934, the salary was continued from January 1, 1934, to July 1, 1934. February 20, 1934, a motion was made and seconded that the rector's salary be paid by check twice monthly on the basis of one hundred dollars per month, with an additional thirty dollars per month for the upkeep of his automobile.

January 30, 1936, a motion was passed, authorizing payment to Reverend James of one hundred dollars per month for the ensuing six months. At that time, the rector pointed out that the motion involved a temporary suspension of his contract with the parish, and required his consent to be effective. He then voted in favor of the motion. At a meeting April 7, 1936, one of the vestrymen called attention to the fact that no agreement had been made between July 1, 1934, and January 1, 1936, relative to the salary reduction. The rector then stated that the difference between the original contract and the amount received, would be $2,610.

Another vestryman stated an agreement had been in effect for reduction previous to January, 1934. Some discussion was had at the meeting, but no action was taken.

At a meeting of the vestry May 5, 1936, vestryman Arthur Harris called attention to the omission from the quarterly report of the amount of the rector's unpaid salary. He stated that its omission from the report might be construed as a waiver of the amount due the rector, which, he felt, the rector did not intend. The motion was carried for approval of the report, Mr. Harris voting in the negative. August 4, 1936, Dean Roberts, a member of the vestry, suggested that the matter of the rector's salary be considered. The rector stated that he did not wish to renew the agreement in so far as it was a bilateral agreement, and stated, "We should make every effort to get back to a normal financial basis this fall."

Following, we set out a portion of the cross-examination of Dean Roberts:

"Q. I want to read from the minutes of August 4, 1936: 'Dean Roberts expressed a desire to take action on the matter of the rector's stipend for the remaining five months of the year, the previous agreement having expired on July the first. Mr. Harris asked whether the new agreement would be a modification of the present contract or a new contract. At this point the rector stated that he did not care to renew the agreement, in so far as it was a bi-lateral agreement.' Is there any doubt in your mind but that the rector was now dissenting and not agreeing to a further reduction of his salary? A. I wouldn't know. Q. What does that language mean to you? Does that mean he agrees to a reduction in his salary? Let me read it to you again: 'At this point the rector stated that he did not care to renew the agreement,'—Doesn't that mean he did not care to renew the agreement? A. Yes. Q. For the reduction of his salary? A. Yes."

The motion was carried that the vestry could only afford to pay the rector one hundred dollars per month. Mr. Harris was then appointed a committee of one to consult the chancellor of the diocese of Olympia relative to the legal obligations under the contract, and make a report to the vestry.

The record of the meeting of the vestry, October 6, 1936, is so important that we set it out as follows:

"Mr. Harris' report on the matter of the Rector's stipend was read in the form of a statement from Mr. Edward W. Allen and Mr. H. C. Force. Mr. Harris stated that these gentlemen had been consulted after consultation with the Bishop and the Chancellor of the Diocese. In Mr. Harris' opinion Messrs. Allen and Force find that the Rector is estopped from receiving any additional compensation from July, 1934, to January, 1936. If the Vestry, Mr. Harris stated, reject this report, they concede the validity of the Rector's claim. If the report is accepted, they deny the validity of any claim the Rector may make. If the Rector wishes to do so, there must be a contract in writing for any future services. Mr. Harris moved that the Vestry express its thanks to Messrs. Allen and Force for their very complete report. This motion was seconded and carried.

"Mr. Blake suggested that the Rector put in a claim before any action is taken on the report of Mr. Harris. Mr. McGibbon stated that the method laid down in the Canons was not followed in this particular case. In his opinion an estoppel arises only under certain specific conditions. The question is whether or not it was intended by the Rector to be a moratorium. His not having made a claim would not affect the action as a moratorium. Mr. McGibbon stated that he did not agree with the report that the action taken was a complete estoppel.

"Mr. Harris moved that the report be accepted. The motion was seconded. The Rector stated that he was making no statement at this time and was not waiving any claim that he may have. He said that neither he nor the Vestry would be the ultimate judges of the question. He wished to be on record as not accepting the report. He believed there are one or two inaccuracies in the report. He reminded the Vestry that the report gives the impression that the matter came before them as a result of an assertion made by the Rector of some claim in the premises. Mr. Harris stated that he particularly called the attention of the two lawyers to the fact that the matter did not move from the Rector. The Rector wished to remind the Vestry that he had never brought the matter before them. He also wished to take exception to the reference in the letter to the statement of grievances against the parish. The Rector stated that he had prepared no statement of grievances against the parish. The

motion was then carried, the Rector's vote in the negative being recorded.

"The Rector stated that he believed this to be the wrong approach to the problem and a bad thing for the parish. He hoped that the parish would get back to normal as soon as possible. Mr. Harris said that the Church, like a corporation, must determine its liabilities and attempt to face them. We know from this report what the legal aspects are. Mr. Bertolin believed that Mr. Harris was right in clearing the record.

"The treasurer's quarterly report and report for the month of September were then presented and upon motion were placed on file.

"Mr. Harris moved that the matter of the Rector's stipend be reduced to writing, in conformity with the Canon, and that the signing of such an agreement be without prejudice to the right of the parish or of the Rector in regard to any back stipend. This motion was seconded. The Rector wished to take exception, stating that there is no agreement and as he lacked advice he felt unable to sign any written statements at this time. Dean Roberts wished to know how long the 'present' would continue, and the Rector replied that it might continue indefinitely. The motion was then carried, the Rector's vote being recorded in the negative."

There was introduced in evidence as exhibit No. 28, an unsigned document which reads as follows:

"Reverend Paul B. James,                    Seattle, October 7, 1936
"Rector, Christ Church Parish,
"Seattle, Washington.
"Dear Mr. James:
"Pursuant of the action of the vestry of Christ Church Parish at its regular monthly meeting yesterday, and in conformity with the canon providing that matters of stipend must be reduced to writing, I beg to advise you that the vestry offers you a stipend of one hundred dollars a month until January 1, 1937, the vestry, of course, acting in its representative capacity and not individually. It is expressly agreed that this instrument is without prejudice to either the rights of yourself or of the vestry and parish in any controversy concerning any unpaid back stipend. Your signature in duplicate on this instrument will complete the con-

tract; you will please retain a copy for yourself and one will be filed in the vestry records.

> "Yours very truly,
> "CHAIRMAN, FINANCE COMMITTEE,
>    on behalf of the vestry of
>    Christ Church.

"Accepted:

--------------------------------------------------------------------------------

"Rector"

Relative to this exhibit, Mrs. James testified as follows:

"Q. Do you recall any member of the vestry visiting your husband on or about the evening of October 7, 1936? A. Yes, I do, distinctly. Q. Who was it? A. Dean Roberts. Q. Were you present when Dean Roberts and your husband talked? A. I was not. Q. Do you know where they talked? A. In the office of the church. Q. Did you see your husband after the discussion? A. Immediately. Q. Did he have anything with him? A. He had a document which Dean Roberts had brought with him. Q. Showing you Plaintiff's Exhibit 28 for identification, what is that? A. This is the letter, addressed to Reverend Paul B. James, with two places left for the signature of the chairman of the finance committee on behalf of the vestry of Christ Church, and for the rector's signature. Q. When did you first see that piece of paper? A. When my husband brought it in after his conversation with Dean Roberts. Q. What was your husband's demeanor at the time? A. He was very, very angry."

The evidence given by appellant was not disputed.

From the October 6th meeting until the death of Reverend James, the minutes of the vestry are silent except in so far as they show the annual reports, with salary disbursements listed ranging from $1,100 to $1,450.48.

The uncontroverted evidence presented to the court reveals that the rector had never made a demand for payment in excess of the amounts received, nor did he complain to the vestry that he was not being fully paid.

The 1940 and 1941 parochial reports made from Christ Church Parish to the diocese of Olympia, stated the salary of the rector to be three thousand dollars per year. The records of the diocese show that the salary upon which his pension payments were based was twelve hundred dollars

per year for the years November 1, 1932, until September 1, 1942.

March 10, 1942, a proposed budget was presented to the vestry for approval, in which appeared the following:

"On account rector's stipend                    $1200."

The proposed budgets of 1934, 1936, 1937, and 1938, list the rector's salary as twelve hundred dollars.

In 1942, a budget was also prepared by the rector for the benefit of canvassers to aid them in raising funds for the church. It was included in a packet with other material which was given them and contained the following items:

" *Allowance in lieu Rector's Stipend        $1200.00
" **Rector's Auto Expense Allowance            360.00"

In the footnotes, these items are explained as follows:

" *Full stipend per contract $3000. per year; only 'token' payments during past 10 years.
" **Really a further payment in lieu stipend, called 'Auto Exp.' to save Pension Premium."

The rector's pension payments, being seven and one-half per cent of the total stipend for which the parish was responsible, were made and reported to the diocesan council on the basis of twelve hundred dollars per year, and were forwarded to the New York office of the church pension fund, which office issued receipts stating: "If the figures and dates do not agree with the facts, you are requested to communicate with the fund."

These receipts were received by Reverend James. There is no showing that he ever communicated with the fund in regard to changing the amount of the salary as listed.

In the annual treasurer's report to the parish for 1937, there is listed as owing on the rector's stipend and automobile allowance for 1936 and 1937, the sum of $695. The yearly parochial reports to the diocese of Olympia list liabilities, but salary arrears are not shown in the 1937 report.

Finding No. 5, made by the trial court, contains a recital of the facts which we have just set out. Finding No. 6 is to the effect that the defense of waiver had been clearly established by a preponderance of the evidence; that the decedent

by his acts and conduct voluntarily waived and relinquished his right to collect any salary in excess of one hundred dollars per month, plus the car allowance during the period in question, after the statute of limitations had begun to run. Further, that there was no evidence that the decedent ever made any demand for the payment of any amounts in excess of those just mentioned, during the period to which reference has been made. Then follows a recital relative to the budgets and reports to which we have called attention.

Finding No. 7 recites that the rector was in charge of all the church and financial affairs, knew the financial condition of the church, and that it was unable to pay a salary of three thousand dollars per year after the discontinuance of the annual contribution of one thousand dollars by the diocesan council. Further, that he voluntarily waived his right to collect any salary in excess of one hundred dollars per month. Further, that after November 22, 1932, and until September 1, 1942, he made no claim for any unpaid salary based upon the original agreement, and therefore waived any right to collect any salary in excess of one hundred dollars per month.

Finding No. 8 sets out some of the provisions of the tentative budget prepared by Reverend James in 1942, and submitted by him to the canvassing committee for church contributions and pledges.

Finding No. 10 reads as follows:

"That all salary earned by the Reverend Paul B. James and all Rectory rental, automobile allowance, and all sums due and owing him for services rendered up to the time of his death on September 1, 1942, have been fully paid except in the sum of $1698.68, which amount the defendants admitted in Open Court had not been paid to decedent at the time of his death; that notwithstanding the application of the Statute of Limitations, the defendants consented to the entry of judgment in favor of the plaintiff in such amount."

■ The determination of this case depends upon whether Reverend James waived the payment of sums due under the contract of January, 1922.

"A waiver is the voluntary relinquishment of a known right, and may be either express or implied. An express

waiver is governed by its own terms, and hence is not often the subject of much dispute. An implied waiver may arise where one party has pursued such a course of conduct as to evidence an intention to waive a right, or where his conduct is inconsistent with any other intention than to waive it. An estoppel is a preclusion by act or conduct from asserting a right which might otherwise have existed, to the detriment and prejudice of another who, in reliance on such act or conduct, has acted upon it. A waiver is unilateral and arises by the intentional relinquishment of a right, or by a neglect to insist upon it, while an estoppel presupposes some conduct or dealing with another by which the other is induced to act, or to forbear to act." *Reynolds v. Travelers Ins. Co.,* 176 Wash. 36, 28 P. (2d) 310.

Our conclusion is that the rector waived the contract payments due prior to August 4, 1936, and that subsequent to that date, there was no waiver on his part. The rector knew that his church was unable to pay the three thousand dollars per year. He acquiesced in the preparation of the budgets in which his salary was fixed at twelve hundred dollars per year. At times he voted in favor of resolutions which reduced his salary and, at one time, returned a check given him by the church. All this was prior to August 4, 1936. After that date, a different situation is disclosed by his actions and the actions of the members of the vestry. On the date mentioned, he stated that he did not wish to renew the agreement relative to the salary reduction. That he refused to waive payments under the contract, is borne out by the cross-examination of Dean Roberts, which we have set out.

Again, on October 6, 1936, it appears from the minutes of the vestry meeting that neither the rector nor the members of the vestry considered that the contract as originally written had been changed. At that meeting, Reverend James took exception to the movement which sought to reduce to writing a modification of the original agreement, and refused to sign "any written statement."

Exhibit No. 28 was evidently prepared for the purpose of changing the contract of 1922, in order to meet the provisions of the church where a regulation which declares that

a contract entered into relative to the payment of a rector may not be diminished or increased, except by an agreement in writing. The rector's action in regard to the modification proves his determination to stand by the contract which provided for a stipend of three thousand dollars per year. True, the members of the vestry had not signed the instrument. However, the fact that it was brought to the rector by a prominent member of the governing body of the church, and that it was not signed by Reverend James, indicates his frame of mind.

Another document, the canvassers' budget for 1942, shows the rector's intention to claim his salary of three thousand dollars per year. The budget prepared by him stated, "Full stipend per contract $3000. per year; only 'token' payments during past 10 years."

In stressing the action of the rector, we have in mind the rule that waiver is unilateral and is not based upon the action or conduct of the opposing party. We hold that there was no waiver of the terms of the original contract subsequent to August 4, 1936.

▮ The reasons we have just given, apply to the defense of estoppel.

" 'Estoppel by misrepresentation, or equitable estoppel, is defined as the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person who in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right either of contract or of remedy. This estoppel arises when one by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts. [21 C. J. 1113]' " *Strand v. State*, 16 Wn. (2d) 107, 132 P. (2d) 1011.

▮ Certainly, the rector did not misrepresent his stand at any time. In 1936, he determined to collect his salary

fixed by the terms of the written contract. The members of the vestry were well aware of his intentions in the matter. Under the circumstances, estoppel does not lie. Appellant is entitled to recover three thousand dollars per year for a period of six years prior to the death of her husband, less amounts already paid.

The judgment is reversed, with instructions to proceed in accordance with this opinion.

MALLERY, C. J., MILLARD, JEFFERS, and SCHWELLENBACH, JJ., concur.

---

December 15, 1947. Petition for rehearing denied.

